COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                              DISTRICT COURT DEPARTMENT
                                                          DEDHAM DIVISION

GREYSTAR MANAGEMENT SERVICES  LP;           )
RAR2 JEFFERSON AT DEDHAM STATION –          )
MA, INC.; DEUTSCHE BANK; SIMPSON            )          SUMMARY PROCESS
GUMPERTZ & HEGER INC.; ASHTON LAW           )           DOCKET NO: 1554SU000026
PC;  LAURA DONAHUE; SARAH MCNEELY;          )
CHRIS ESMOND; NATHAN TRAVALGIA; JOE         )
GIULIANNO; DONNA ASHTON; DEBBIE             )          Original Trial Date: 5/14/15
WEBRE; W. TODD HENDERSON; ROBERT A.         )
FAITH; J. DEREK RAMSEY; BILL MADDUX;        )          Rescheduled Trial Date: 5/28/15
MATTHEW LUPICA,                             )
                                            )          (Discovery requested)
                                            )
    Plaintiff,                              )
                                            )
v.                                          )
                                            )
ANDRE BISASOR; NATALIE ANDERSON,            )
                                            )
    Defendants.                             )

## SUMMARY PROCESS ANSWER
## COUNTERCLAIM AND JURY DEMAND

Pursuant to Uniform Summary Process Rules, the defendants-tenants hereby respond to the Plaintiff's summary
process complaint as follows:

### INTRODUCTION

This is a general overview of some of the issues, challenges, and harm we have encountered with our landlord.  We
have appealed these issues as whistle-blowers all the way up to Deutsche Bank, who is the ultimate owner of the
property along with RAR2 Jefferson at Dedham Station-MA Inc (dba Jefferson at Dedham Station) and Greystar
Management Services LP (the property management agent), and Donna Ashton Law Offices, to prevent them from
engaging in retaliatory eviction (together herein referred as "Jefferson"), as well as to protect our rights. It is worthy
of note that as recent as on Tuesday, 4/14/15, Jefferson's lawyer, Donna Ashton tried to distance Deutsche Bank
from any accountability as Jefferson's owner by denying that they are the actual owner. This is while we have clear
proof that they (Deutsche Bank) are in fact the owner of the property, and after Donna Ashton herself and
Deutsche Bank themselves have acknowledged as much in writing.  This is another sign of bad faith, and of unfair
and deceptive business practices.

To be clear, after months of appealing to reason and ethics, Jefferson refused to deal with us on a good-faith basis, and instead threatened and started the process to evict us. We have been appealing to Jefferson management since April 2014—for an entire year now—when the elevator in our building was first condemned by the State. It was only after several intense rounds of communications (indeed strong advocacy and negotiation on our part) where we provided evidence of Jefferson's outrageous behavior and wrongdoing, to Deutsche Bank's Board of Directors and Management Board, that mediation was finally proposed. However, because no key decision-maker from Deutsche Bank was present at the negotiation table so-to-speak, Jefferson managers were unwilling or unable to shift out of their default tendency/culture of twisting the truth, hiding certain facts, not taking responsibility or accountability for their acts, blame-shifting, etc to manipulate the situation in their favor (this they are quite skilled at). Deutsche Bank claimed that they would investigate the matter—the results of which were not presented to us—so we are not sure if an investigation actually took place because we were never interviewed.

That said, Jefferson has been engaging in several wrong and unlawful acts against me and my wife, as well as other tenants including racial discrimination, disability discrimination, retaliation, unfair and deceptive practices, among other things. We have evidence of these acts. We were denied alternative housing, though we asked more than once about accommodations for those with medical conditions that make traversing the stairs a real hardship (i.e. four floors/over 80 stairs). We were also retaliated against. Yet no one at Jefferson has engaged us to investigate these issues and seek information from us that can prove these wrongdoings. Instead, we have been hounded, harassed, threatened, bullied, intimidated, badgered, pushed around, ignored, rebuffed, belittled, and disrespected by Jefferson or otherwise ignored by upper management of Greystar and the Boards of RREEF and RAR2 Jefferson at Dedham Station.

Jefferson has refused to investigate wrongdoing by its staff, and has instead sought to get rid of us because we have brought attention to these issues by first complaining to property staff, then to the Town of Dedham, then to Greystar upper management, then to State officials, then to the Board of RAR2 Jefferson, then to Deutsche Bank. Instead, Jefferson has tried to evict us, which was only recently been put on hold to allow for a voluntary mediation, only after we provided evidence of wrongdoing along with our plea for intervention by Deutsche Bank.

We are still awaiting a status on my request to the Deutsche Bank board for a full investigation into the activities of Jefferson as well as the RREEF/Deutsche Bank employees who have sat by and done nothing regarding these matters outlined herein and attached. These persons have engaged in provable wrongdoing which will be borne out by a thorough investigation. Also, Jefferson has failed to respond to the 93A demand letter within the 30 days allotted; however they did send a response after the fact (while we were awaiting the mediation), denying much of our claims and did not provide a counter-offer.

We believe that based on all the evidence we have in our possession, Jefferson has significant liability and that we are owed damages in our case (and there is potentially a class action to include other tenants).

## BACKGROUND SUMMARY

As a brief background, we are both Black, U.S. citizens, originally from Jamaica. We have lived at this property since 2008 (about 7 years now). Upon confirming tenancy, Jefferson made several representations to us, including

promises/commitments about the general amount and frequency of rent increases (i.e. that if there were any, it would generally be around $50 but never above a $100 increase), which they have reneged on. Since then, the Landlord has charged us exorbitant rents with around $300-400 annual rent increases which seems equivalent to a "black tax" or "premium charge" to us as Black tenants, in an attempt to either force us out of our home or otherwise to take advantage of us (NB: some Black tenants report $500 rent increases). We have evidence that they have charged other similarly situation White tenants a fraction of what they have charged us for equivalent/identical units, including much more favorable rent increases and extra long lease terms, which they have denied us.

Most recently, Jefferson has engaged in a number of illegal and unfair/deceptive practices that has caused us much harm/damages and pain and suffering. That said, Jefferson did represent to us in or around May 2014 that they would work on providing a settlement to us, but they never followed through. They also said they were amenable to moving us to an alternative permanent apartment unit, but they reneged on that as well (only recently adding new stipulations that we need to pay all the monies they are demanding before they will allow us to move to a more suitable unit). For the record, they represented to us (as per the new lease contract we signed in May 2014) for the temporary unit #2216, that we would not be charged anything for that unit, and so we have a "$0" lease agreement. As for our original apartment #3413, we told them that we would be withholding rent until the elevator was fixed as well as the ongoing issues in that apartment. And so, they understood our position, and did not object, at least not initially. However, they later back-tracked on our understanding about the rent withholding, and issued a notice to quit, but then "withdrew" it. It is worthy of note that other tenants also withheld rent due to the elevators being down.

Beyond that, Jefferson has gone back and forth (i.e. flipped-flopped) about putting together an offer for us related to the harms we have suffered as a result of their misconduct, etc. They had also told us and we understood that we would not be required to pay back-rent for our primary apartment (which we were no longer occupying), and that after we moved back to that unit, we would only be charged going forward. However, Jefferson has gone back on that commitment as well, and has since demanded we pay back-rent for that unit (that we were displaced from), as well as the zero-rent temporary unit. This is in retaliation for us speaking up about mistreatment and discrimination, etc.

Our lives have been turned upside down due to this situation. We have lost critical work time, personal time, even family time having to deal with these issues related to being displaced from our home as well as managing an onslaught of relentless harassing behavior, attacks and unfair tactics by the Landlord and their lawyers. Our quality of life and family and social gatherings have been affected as a result of the loss of use of our home. It has also been a hardship having portions of our business and personal effects and various items including files/documents, equipment, materials etc in one place while we're in a small temporary unit. Even simple things such as getting urgent or couried mail has been impacted because they refuse to allow us to receive mail or package delivery in the temporary unit (i.e. they refuse giving us the mailbox key for the temp. unit), in addition to the impact on accessing our storage unit (next to our unit 3413 on the fourth floor of building 3) due to the elevator issue. We've had to pay for utilities in our home that we are not able to use. They have allowed us limited services and access in the temporary apartment which has impacted our quality of life and peaceful enjoyment of our home (i.e. though they promised to provide equivalent services in the temporary unit but reneged by withdrawing proper services and providing only limited services; and they have allowed our utilities to be shut-off several times due to non-payment

even-though they receive several payment reminders every time from the utility provider).  In addition to an
inadequate couch with bad cushions/support, they have refused to provide us a proper bed (i.e. a cheap unstable
and shaky bed which has caused us injury) and they have maliciously refused to replace the bed though they
promised to do so. Most recently, when asked again about this, they lied and said that they thought it was taken care
of, and then later when we made a formal request from our doctors with a reasonable accommodations request, they
simply denied the request saying there is no proof that the bed is causing us injury.  They have even refused to assist
us with moving our own bed from unit 3413 though we asked because they don't want to be liable for any damage
during moving. Consequently, we've had to endure sleeping apart as husband and wife for a year due to the
inadequate bed and furniture provided which has caused us injury and medical issues, and stress/setbacks in a fairly
young marriage where we were trying to conceive.  This entire thing has derailed our plans to start a family. At our
age, we are now saddled with neck and back and issues, as well as leg/foot issues requiring months of physical
therapy for us both.

Though we notified management to add a note in our file to not enter our home without an appointment,
maintenance has continued to enter our home on multiple occasions without our permission.  My wife has been
traumatized by illegal entry by maintenance (where there was no announcement or appointment, just a random
entry) into our home while she happened to be at home in the shower naked.  This was a traumatizing experience
that has resulted in nightmares for my wife, and caused tremendous anguish.  This is in addition to management's
collusion with and/or negligence related to maintenance staff entering our home, which has resulted in us having to
call the police twice to make report these entries and theft of property coming to the point that we have been forced
to purchase a security system with cameras.

Jefferson has refused the basic reasonable accommodations request we have made to them (though they initially
signaled in writing that they agreed, they later reneged on that agreement.  This was after we provided letters from
our doctors confirming our medical condition/disability).  They have also used intimidation and harassment tactics
coming to our door and banging and talking loudly causing an unnecessary scene. They've also demanded to enter
our home for non-emergencies in the middle of the holidays, as opposed to coordinating with us to schedule an
appointment.  Their staff, including their maintenance staff and their process server, has come to our door
eavesdropping on our conversations—we've actually caught them in the act.  In fact, subsequently their own process
server lied in a sworn statement about delivering a document to us for court, but this was not true and we have
video-recorded evidence from a home security camera to prove it.

Also, most recently in February 2015, when our apartment flooded requiring that they had to rip up the carpet in the
master bedroom and bring in equipment to dry out the water, they refused to try to find investigate the source of the
breach or make appropriate attempts to fix it.  They also did nothing to address the strong mold smell (though it
further inflamed my wife's asthma).  They also refused to do anything else to remediate the mold, such as removal
of the padding or replacing the carpeting.

Additionally, we've been complaining about a non-working dishwasher for years, and they have never successfully
fixed it.  They did recently replace it with a more basic/smaller dishwasher, but that dishwasher was worse, and
wasn't even installed properly.  It had loose parts still in the washer and even though we pointed this out to the

maintenance supervisor, he never fixed it.  Also, the washer continues to flood and leak, and the shoddy installation has blocked us from being able to freely open a kitchen drawer that stores our utensils.

We have issues that signal that there is a structural problem where the leveling is off kilter, such that some doors don't shut, whereas others swing/close on their own and won't stay open.  We also have jamming windows that are difficult to open or close, as well as bunching carpets and displaced floor panels.  We were told by several State officials both at the Dept of Public Health and the Dept of Public Safety that these issues, combined with the cracking throughout the apartment are tell-tale signs of a structural issue.

Maintenance continues to be disrespectful and rude to us, refusing to engage us when we are talking to them (particularly the maintenance supervisor, who takes his cues from the negative and dismissive attitude that management has shown to us) or if we ask questions about an issue with the apartment, sometimes walking away without acknowledging us when we're in the middle of a sentence.  We also have a leaky water heater that has greenish/bluish gunk corrosion buildup on the pipes, we've asked maintenance to address this and they refused to.  The maintenance supervisor said the corrosion probably resealed the leak so he's leaving it as is.  Management was also aware but has done nothing to address to it.  We are concerned about the safety of the water and the soundness of the water heater.  In fact, one of our neighbors said maintenance didn't properly address a leak in her apartment, and the equipment burst and flooded her home requiring the removal of her furniture and several days of use of fans to dry out her home.  That said, we have been subject to extra hostility from management and maintenance as a result of the concerns we have raised.

There are noxious odors that flare up throughout the entire apartment and affects both of us, but especially causes a major issue for my wife, including headaches, difficulty breathing, difficulty sleeping, etc.

Given these issues, we raised concerns to management but they have refused to address them; and so we have withheld rent in order to force them to properly address these issues.  Instead they have attempted to retaliate and evict us.  We don't want to have to uproot our lives and to be forced to move completely simply because we are speaking up against mistreatment and wrongdoing.  We have built a life, we operate our business, and go to church in Dedham, so we don't want to be scared off and bullied into moving for speaking up for our rights as tenants and citizens.  We are certain that much of the hostility we have been subject to is based on the fact that we are Black, and after we reported the discrimination we experienced, they blatantly proceeded to retaliate against us.

For the bulk of time we've lived at the property, we have not had much interactions or conflict with management (i.e. for the first few years of our tenancy). While there have been some challenges, we are generally quite busy with our work/business, school, and travel so we have largely not made a huge deal about some of the issues we've experienced with Jefferson over the years.  However, there have been certain issues we've brought to the attention of management, including the cracks in our apartment.  Yet they refused to fix this so we were forced to finally report this to the Town of Dedham in 2012, and they issued a citation requiring the cracks to be fixed, among other things.  Instead of fixing the cracks, Jefferson did temporary patches that recracked within a couple of months.  We asked them to fix the cracks, but they did not.  Finally, we called the Town again in October 2014 about the cracks after Jefferson maintenance staff neglected to fix the cracks though we gave them access to do so on several occasions.  Subsequently, the Town's Building Commissioner/Inspector stated that he was concerned that the

cracks may be related to the structural issues that caused the elevator to be shut down.  He stated that given my wife's medical condition, that we should remain in the temporary unit until permanent repairs were made, so as to avoid further exposure (he is also a leader in the Town's Commission on Disability).  As a result of that inspection of our unit (as well as a brief look at the common areas), he ordered an Engineer's Evaluation.

Jefferson has erected roadblocks to prevent our primary apartment from being included in the engineer inspection ordered by the Town of Dedham, after they inspected our apartment cracks etc.  Instead Jefferson manipulated us and lied about the appointment date in order to exclude our unit from being evaluated by their own engineer in December 2014.  It was only following numerous appeals by us, Deutsche Bank's involvement, the recent flooding of our home, further appeals by us to the Town, that they finally allowed the engineer evaluation at the end of February 2015.  Nevertheless, they attempted to rush the engineer in an appointment overseen by Jefferson management.  Furthermore, the engineer doing the evaluation had incomplete information or misinformation about the larger context of the situation, including the elevator etc).  Additionally, the engineer results were not given to us until a few days ago (on 4/11/15) after my request for a status (while Jefferson received those results a month ago).

Our concern about the cracks in our primary home is highlighted by the impact of not having a working elevator for much of 2014.  My wife and I have been displaced from our home and have been in a temporary apartment unit since after the elevator in our building was condemned and put out of service by the State (in mid-April 2014) due to structural concerns related to cracking and rapid state of "settling" (or sinking) in the elevator shaft.  This has been the case until the State finally agreed to Jefferson's own appeals that they not be required to do the mandated fixes required by the State before the elevator could be operational.  The State has expressed concern about a catastrophic failure of the elevator that would put residents at risk.  The State finally relented after Jefferson refused to make the repairs and they and their attorneys and engineer made numerous appeals (causing months and months of delays) requesting that the State allow interim fixes via essentially a temporary patch-up which was finally done in December 2014, before the elevator was fully operational again.  Yet, we have been trying to get the related and ongoing issue of cracks etc in our permanent apartment addressed prior to moving back to that unit, due to safety and health concerns, as well as due to the equities involved in renting a sub-par deteriorating apartment unit.  The landlord refused to budge to provide an engineer assessment until well after our pleas to Deutsche Bank, the Town, the State, as well as a flooding our bedroom (from water leaking in and causing which resulted in mold and noxious odors, etc.), forced them to re-consider their approach, and this was only after the mediation was already being contemplated.

NB: Due to time constraints, this brief summary does not capture a number of issues including our impacted health issues and a number of other things that the Landlord. However, further details are largely outlined in the remainder of the body of this document.

## FACTUAL BACKGROUND

1. We are Andre Bisasor and Natalie Anderson. We are co-tenants. We are married.

2. We live at 3000 Presidents Way #3413, Dedham, MA 02026. We moved in on or about July 2008. This is building 3 of the property.

3. We also live at 2000 Presidents Way #2216, Dedham MA 02026. We were displaced to this unit in May 2014 until the present time due to a broken elevator that serviced our apartment 3413 in building 3 and because of structural problems that affected our health/wellbeing in unit 3413.  This unit is located in building 2 of the property.

4. We are charged rent of $2390 per month for unit 3413. We do have a written lease for unit 3413.

5. We are charged $0 in rent per month for unit 2216. We do have a written lease for unit 2216.

## DEFENSES FOR POSSESSION

### Summary of Defenses for Possession

6. Tenants deny that they are living in the premise unlawfully and against the right of the Landlord.

7. Tenants deny that they owe the Landlords the amount of rent listed in the complaint.

### *Affirmative Defenses*

8. FIRST AFFIRMATIVE DEFENSE: The Landlords do not have a superior right to possession or standing to bring this claim.

9. SECOND AFFIRMATIVE DEFENSE: The Landlords do not state a claim upon which relief can be granted.

10. THIRD AFFIRMATIVE DEFENSE: The Landlords lack grounds to terminate the Tenants' tenancy. Even if the tenancy was terminated, which is denied, a new tenancy has been created by the Landlords' conduct.

11. FOURTH AFFIRMATIVE DEFENSE: Based on principles of equity and fairness, it is unfair to evict Tenants.

12. FIFTH AFFIRMATIVE DEFENSE: The Tenants are not now and have not in the past been in violation of their lease agreement sufficient to justify termination. The Landlords are therefore barred from seeking possession of the premises and this complaint must be dismissed.

13. SIXTH AFFIRMATIVE DEFENSE: Article 114 of the Massachusetts State Constitution prohibits discrimination against or the exclusion of disabled individuals solely by reason of his or her disability from

programs or activity within the Commonwealth. The Tenants have disabilities that are verified and this eviction is the result of a failure to accommodate these disabilities.

14. SEVENTH AFFIRMATIVE DEFENSE: The Landlords do not have good cause to evict the Tenants. The Landlords are therefore barred from seeking possession of the premises and this complaint must be dismissed.

15. EIGHTH AFFIRMATIVE DEFENSE: Landlords are seeking to terminate tenancy in retaliation after Tenants withheld rent for bad conditions on the premises, after Tenants reported these bad conditions to various local and state officials, after Tenants raised concerns about discrimination and other wrongs, and after Tenants engaged in tenant organizing activity. The Landlords are therefore barred from seeking possession of the premises and this complaint must be dismissed.

16. NINTH AFFIRMATIVE DEFENSE: Landlords have breached the warranty of habitability and violated the state sanitation code. The Landlords are therefore barred from seeking possession of the premises and this complaint must be dismissed.

17. TENTH AFFIRMATIVE DEFENSE: Landlords have breached the covenant of quiet enjoyment with Tenants. The Landlords are therefore barred from seeking possession of the premises and this complaint must be dismissed.

18. ELEVENTH AFFIRMATIVE DEFENSE: Landlords have not properly brought the case or served process. Therefore this complaint must be dismissed.

19. TWEFTH AFFIRMATIVE DEFENSE: Landlords have not filed this action in the proper venue and the amounts being sought by Landlords are likely to amount to more than the District court limit of $25,000. Therefore this complaint must be dismissed.

20. THIRTEENTH AFFIRMATIVE DEFENSE:  The Landlords have breached material terms of the rental agreement and violated other laws related to the tenancy including the security deposit law and the law of the covenant of "quiet enjoyment" of the apartment.  The Landlords are therefore barred from seeking possession of the premises and this complaint must be dismissed.

21. FOURTEENTH AFFIRMATIVE DEFENSE:  Tenants reasonably relied upon relied on landlord's conduct and representations in failing to tender rent.

22. FIFTEENTH AFFIRMATIVE DEFENSE: The court lacks subject matter jurisdiction.

23. SIXTEENTH AFFIRMATIVE DEFENSE: Landlords have waived their rights due waiver, laches, estoppels and unclean hands. The Landlords have waited a year to bring this eviction suit and this long delay in asserting the right or claim has prejudiced the Defendants i.e. as a sort of "legal ambush." Tenants have lost evidence, witnesses, and a fair chance to defend themselves after the passage of time from the date acts occurred. Defendants have incurred disadvantages because for a long time they relied on the fact that no breach occurred or no lawsuit would be started. Thus the case should be dismissed in the interests of justice.

---

*Defense*
**Tenancy Not Properly Terminated and Case Not Properly Brought**
**(**Mass. Gen. Laws, c. 186, §§11-13, 17 )

---

24.     Defendants re-allege and incorporate all paragraphs above as if fully set forth herein.

25. The landlord did not terminate our tenancy properly  and case not properly brought as follows:

a. **The Notice to Quit for unit 3413 is defective because it included late fees.**

    i. Defendants are tenants in rental housing owned by RAR2 Jefferson at Dedham Station and managed by Greystar Management Services LP ("Landlord" or "Plaintiff"). The parties had a lease agreement, according to which Defendants were responsible for payment of $2390 per month.

    ii. Plaintiff's termination notice is fatally defective for failing to comply with the Massachusetts statutes. Since the notice is in fact insufficient, this deprives the Court of jurisdiction over this eviction action. The notice is insufficient because it contained a demand for late fees in addition to rent, including late fees that were not yet due. All rent due does not include late fees. This failure is sufficient to find that the notice was ineffective and, therefore, insufficient as far as being the basis of eviction action.

    iii. A Defendant's motion to dismiss should be granted if a plaintiff would not be entitled to relief from a defendant under any set of facts that could be proven in support of the plaintiff's complaint.

    iv. Actions for eviction that are due to nonpayment of rent are strictly regulated by statute. Proper termination for nonpayment of rent which requires a written notice that legally required or sufficient information and that does not violate the law or is otherwise illegal.

    v. In considering the sufficiency of a termination notice, a critically important factor is whether the statute has been complied with and not whether the tenant has been misled by the notice given.

    vi. Because service of a valid and proper notice to quit is a condition precedent to maintaining a trespass and ejectment action, plaintiff failed to properly invoke the jurisdiction of the court i.e. that tenancy is not terminated without proper notice, regardless of landlord's intention.

    vii. Also, Tenants are not liable for late fees where tenants properly withheld rent.

    viii. A proper Notice to Quit is a condition precedent to an action for eviction. When less than all the requisite elements of a cause of action exist when the complaint is filed, the complaint must be dismissed without leave to amend. *Rolling Oaks Homeowner's Assn. v. Dade County,* 492 So. 2d 686 (Fla. 3d DCA 1986).

    ix. Therefore, this case should be dismissed because the court's subject matter jurisdiction was not invoked properly. Therefore, the notice did not provide an adequate basis for initiating an eviction action. This holding is in agreement with previous termination-of-tenancy cases that have required strict compliance with notice requirements.

    x. Defendant's Motion to Dismiss should be granted and Plaintiff's Complaint should be dismissed with prejudice and without leave to amend.

b. **The Notice to Quit for unit 3413 is defective because it includes issues that predate the parties' current lease and tenancy. In support thereof, the defendants states as follows:**

    i. Plaintiff never terminated the tenancy and thus may not proceed with a summary process action under G.L. c. 239 §1 and G.L. c. 186 §11.

    ii. The parties executed one prior term lease that expired on September 14, 2014.

    iii. The parties' current term lease was automatically renewed thereafter.

    iv. The plaintiff/landlord's notice to quit dated December 23, 2014, states that defendants were being evicted for non-payment of rent for months in the prior term.

    v. The plaintiff's notice to quit refers to issues that predate the current tenancy.

vi.  Where, as here, the plaintiff/landlord is relying on incidents arising from a prior tenancy or lease with the defendant/Tenant, these cannot serve as the basis for recovery of possession in a summary process action. See Nyack Plaza v. Parker, 18 Misc.3d 126(A), 856 N.Y.S.2d 25 (Table), 2007 WL 4355300 (N.Y. Sup. App. Term); CMJ Management Co. v. Paris, Boston Housing Court No. 96-SP-03148 (Winik, J., November 22, 1996) (incidents occurred prior to most recent lease renewal); Commonwealth-Babcock Associates v. Kibbi, Boston Housing Court No. 96-SP-01741 (Winik, J., April 26, 1996) (claim for rent due under a prior lease must be pursued in a separate contract action); Weld Park Apts v. Jones, Boston Housing Court No. 12-SP-4325 (Winik, F.J., Dec. 5, 2012) (same); Grant Manor, LP c/o Cornu Mgt. v. Gerena, Boston Housing Court No. 04-SP-02581 (Nasif, J., December 23, 2004) (claim for rent due under previous occupancy cannot be a basis for claim for possession under new lease). See also Montgomery Gateway East I v. Herrera, 261 N.J. Super. 235, 241, 618 A.2d 865, 867 (1992) (new or renewal lease operates as waiver of right to dispossess for past defaults); State Farm Fire & Casualty Co. v. Firmstone, 9 A.D.2d 812, 780 N.Y.S.2d 820 (N.Y. Supreme Ct., App. Div., 3 rd Dept., 2004); Felton v. Strong, 37 Ill.App.58 (Ill. App. 1st Div. 1890).

vii.  The plaintiff/landlord is confined to the grounds assigned in its notice to quit. U.S.P.R. 2(d). See Roseman v. Day, 345 Mass. 93, 185 N.E.2d 650, 654 (1962); Strycharski v. Spillane, 320 Mass. 382, 69 N.E.2d 589, 591 (1946); and Tuttle v. Bean, 54 Mass. (13 Metc.) 275 (1847) cited in Flaschner Judicial Institute, Residential Summary Process Bench Book (1991). See also Pine Grove Village, Inc. v. Cardullo, 2001 Mass. App. Div. 234, 235, 2001 Mass. App. Div. LEXIS 84 (incumbent upon owner to establish that tenant committed those violations of the terms of the lease specifically identified and alleged in the notice to quit).

viii.  WHEREFORE, this action must be dismissed or the Court is without jurisdiction to entertain this summary process action

**c.  The Notice to Quit for unit 3413 is defective because it contains confusing language regarding when the Tenants should deliver the premises and how much time they had to cure.**

i.  There is an overshadowing in the notice to quit that contained the 14 day notice to quit as well as the 30 day FDCPA "Miranda warning".

ii.  Even if the FDCPA statutory notices are given, a violation of the FDCPA may still occur if additionally language in the notice is found to have "overshadowed" or contradicted by other language in the collection letter. The Second Circuit Court of Appeals has stated "[w]hen a notice contains language that 'overshadows or contradicts' other language informing the consumer of her rights, it violates the Act." In Russell v. Equifax, 74 F.3d 30, 34 (2nd Cir. 1996), the court found that despite the proper statutory notices, a violation of the FCDPA occurred when the debt collector added the following language to the letter "If you do not dispute this claim (see reverse side) and wish to pay it within the next 10 days we will not post this collection to your file." Therefore, all that a plaintiff needs to show is a contradiction between the required notices and other language in the letter.

iii.  We were thus presented with two different and conflicting statements. If we believed the message printed on the bottom of the notice, we would understand, as the FDCPA intends us to, that we had 30 days to decide whether to contest the claim. But, if we

believed what was printed on the top of the notice, we would fear that unless we
decided not to dispute the claim and to pay it within 14 days, the alleged debt owed
would result in legal action and eviction.

iv.   Any notice sent by the debt collector (which demands payment before the expiration
of the 30 day validation period) constitutes an overshadowing violation. Accordingly,
to prevent overshadowing, a debt collector should not include any language in the
original letter which implies a consumer take action prior to the 30 day validation
period.

v.   See Jacobson v. Healthcare Fin. Servs, Inc., 516 F.3d 85 (2nd Cir. 2008). See McMillan
v. Collection Prof'ls, Inc., 455 F.3d 754, 759 n. 5 (7th Cir. 2006) (stating "a debt
collector can violation § 1692g by contradicting the required information or by
'overshadowing' it' and "a letter can be confusing when it overshadows the necessary
language, when it contradicts the required language or when it fails to explain an
apparent contradiction").

vi.   The notice to quit should not contain confusing language.

vii.   Our notice to quit does contain confusing language.

viii.   A notice to quit, under this statute, is a distinct act upon which important rights and
consequences are made to depend. It must, therefore, be sufficient and perfect of itself
without reference to any subsequent proceedings. It is not made to depend upon them
for its validity, but they upon it. In order for the plaintiffs to sustain the validity of the
notice, in this case, they would have to make the sufficiency of a notice to quit to
depend not upon its own intrinsic validity, but upon the proceedings which are to
follow it. Such a construction would defeat the main object in requiring a notice to be
given to the tenant, for he would then be left to wait for the commencement of the
summary proceedings, in order to ascertain the object of his lessor in giving him the
notice.

ix.   The term, "notice to quit," has a clear, well defined and settled meaning in the law.
When it is used in a statute, it is to be taken and understood in its legal and technical
sense, with all the qualities and incidents which the law regards as essential to it, unless
it is qualified by express enactment. Merchants Bank v. Cook, 4 Pick. 411 ; Rev. Sts. c.
2, § 6, cl. 1. Among the indispensable requisites at common law of a notice to quit, it is
clearly established, that it must indicate to the tenant, with sufficient certainty, that he
is to quit the premises at a certain fixed period, and if any mistake is made in
designating the time at which he is required to leave, the notice will be fatally defective.
If the tenant is required to quit at too early a day, the notice will be unavailing. So, too,
in cases where by stipulation between the parties to a lease a certain notice has been
agreed on for the purpose of determining a lease, it is clearly settled that a mistake in
naming the time when the tenant is required to quit, renders the notice ineffectual. 2
Archb. N. P. 397; Oakapple v. Copous, 4 T. R. 361; Doe v. Lea, 11 East, 312;
Johnstone v. Hudlestone, 4 B. & C. 922; Doe v. Green, 9 Ad. & El. 058; Cadby v.
Martinez, 11 Ad. & El. 720; Hanchet v. Whitney, 1 Verm. 311; Anderson v. Prindle, 23
Wend. 616; Baker v. Adams, 5 Cush. 99 .

x.   The notice given to the tenant is defective in stating amount of time that the tenant
was required to quit the premises, in a confusing manner. We have a right to insist on
the notice required by law, and to treat as a nullity the one given to us, because it was
irregular, and not in conformity to the requirements of the statute. Plaintiffs have

therefore failed to give the tenants a legal notice to quit, and thus cannot maintain their complaint.

xi.    WHEREFORE, this action must be dismissed or the Court is without jurisdiction to entertain this summary process action

**d.    The Notice to Quit for unit 3413 was not submitted to the court along with the Summons and Complaint upon the filing of the case and therefore the case was not properly brought/filed.**

i.    The Uniform Summary Process Rules have been designated as Trial Court Rule I, effective September 1, 1980. Subparts (d)(1) and (2) of rule 2 read as follows: "(d) Entry of Action. Summary process actions shall be entered by filing with the clerk of the court in which the action is to be heard the following documents: "(1) the original of the properly completed form of Summary Process Complaint and Summons, a copy of which has been served on the defendant, with return of service recorded thereon; "(2) a copy of any applicable notices(s) of termination of the defendant's tenancy of the premises upon which the plaintiff(s) relies where such notice is required by law and any proof of delivery of such notice upon which the plaintiff(s) plans to rely at trial . ."

ii.    Therefore the simultaneous filing of the notice together with the complaint is required by the rule.

iii.    Because the landlord ran afoul of Uniform Summary Process Rule 2(d)(2) by failing to file with the clerk on the entry day "a copy of [the] applicable notice of termination [notice to quit] of the defendant's tenancy," the summary process action should be dismissed.

**e.    The Summons and Complaint for unit 2216 is defective and/or was not properly served because it has a wrong address.**

i.    Plaintiff's Summons and Complaint are fatally defective for failing to comply with the Massachusetts statutes. Since the Summons and Complaint are in fact insufficient, this deprives the Court of jurisdiction over this eviction action. The Summons and Complaint is insufficient because it contained a non-existent wrong address. This failure is sufficient to find that the notice was ineffective and, therefore, insufficient as far as being the basis of eviction action.

ii.     A Defendant's motion to dismiss should be granted if a plaintiff would not be entitled to relief from a defendant under any set of facts that could be proven in support of the plaintiff's complaint.

iii.    Actions for eviction are strictly regulated by statute. Proper termination of a tenancy requires a written notice that has legally required or sufficient information and that does not violate the law or is otherwise illegal.

iv.    In considering the sufficiency of a Summons and Complaint, a critically important factor is whether the statute has been complied with and not whether the tenant has been misled by the notice given.

v.    Because service of a valid and proper Summons and Complaint is a condition precedent to maintaining a trespass and ejectment action, plaintiff failed to properly invoke the jurisdiction of the court i.e. that tenancy is not properly brought without proper Summons and Complaint, regardless of landlord's intention.

vi.    A proper Summons and Complaint is a condition precedent to an action for eviction. When less than all the requisite elements of a cause of action exist when the complaint is filed, the

complaint must be dismissed without leave to amend. *Rolling Oaks Homeowner's Assn. v. Dade County,* 492 So. 2d 686 (Fla. 3d DCA 1986).

    vii.   Therefore, this case should be dismissed because the court's subject matter jurisdiction was not invoked properly. Therefore, the Summons and Complaint did not provide an adequate basis for initiating an eviction action. This holding is in agreement with previous cases that have required strict compliance with Summons and Complaint requirements.

    viii.   Defendant's Motion to Dismiss should be granted and Plaintiff's Complaint should be dismissed with prejudice and without leave to amend.

**f.   The Notice to Quit for unit 2216 was not submitted to the court along with the Summons and Complaint upon the filing of the case and therefore the case was not properly brought/filed.**

    i.   The Uniform Summary Process Rules have been designated as Trial Court Rule I, effective September 1, 1980. Subparts (d)(1) and (2) of rule 2 read as follows: "(d) Entry of Action. Summary process actions shall be entered by filing with the clerk of the court in which the action is to be heard the following documents: "(1) the original of the properly completed form of Summary Process Complaint and Summons, a copy of which has been served on the defendant, with return of service recorded thereon; "(2) a copy of any applicable notices(s) of termination of the defendant's tenancy of the premises upon which the plaintiff(s) relies where such notice is required by law and any proof of delivery of such notice upon which the plaintiff(s) plans to rely at trial . . . ."

    ii.   Therefore the simultaneous filing of the notice together with the complaint is required by the rule.

    iii.   Because the landlord ran afoul of Uniform Summary Process Rule 2(d)(2) by failing to file with the clerk on the entry day "a copy of [the] applicable notice of termination [notice to quit] of the defendant's tenancy," the summary process action should be dismissed.

**g.   The tenancy for unit 2216 was specifically renewed by oral agreement and thus requires a new notice to quit, which has not been served.  Therefore the case was not properly brought/filed.**

26. Even if our tenancy was terminated for 3413 or 2216, a new tenancy has been created by our landlord's conduct.

27. The landlord does not have a superior right to possession and/or does not have standing to bring this action.

28. The landlord's case should be dismissed because the Landlords have not filed this action in the proper venue and the amounts being sought by Landlords amount to more than the District court limit of $25,000. Therefore this complaint must be dismissed.

29. The Complaint of Landlord should be dismissed in favor of a prior pending action between the same parties in Norfolk Superior Court, or to transfer and consolidate this action with the Norfolk Superior Court action as follows:

    a.   **This Action Should be Dismissed Because the First-Filed Rule Clearly Favors The Norfolk Superior Court Action.**

Massachusetts Rule of Civil Procedure 42(a) provides that when "*actions involving a common question of law or fact are pending before the Court, in the same county or different counties," the Court "may order all the actions consolidated; and it may make such orders concerning the proceedings therein as may tend to avoid unnecessary costs or delay.*"  Mass.R.Civ.Pro. 42(a).

Under the "first-filed rule," the first-filed complaint is generally preferred. Kleinerman v. Luxtron Corp., 107 F.Supp. 2d 122, 124 (D.Mass. 2000); Holmes Group v. Hamilton Beach/Proctor Silex, 249 F.Supp. 2d 12, 15-16 (D. Mass. 2002).  Application of this principle clearly favors Norfolk Superior Court as the proper venue for this case.

In addition, Massachusetts Rule of Civil Procedure 12(b)(9) provides as follows:

> Every defense, in law or fact, to a claim for relief in any pleading… shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:…(9) Pendency of a prior action in a court of the Commonwealth. Mass.R.Civ.Pro. 12(b)(9).

"A dismissal under 12(b)(9) may be appropriate if the parties and issues are identical to those in the prior pending action. See, Smith & Zobel, Rules Practice §12.15.1 (1974 & Supp. 1992)."  Harvard Community Health Plan, Inc. v. Zack, 35 Mass. App. Ct. 649, 652 (1992)(additional citations omitted); see also, Conant v. Kantrovitz, 29 Mass. App. Ct. 998, 999 (1990).

This Rule provides additional authority for dismissal of this action based on the pendency of the Norfolk Superior Court Action.

### i.   Competing Actions

a.   The Tenants filed first in Norfolk Superior Court. The Tenants filed the Norfolk Superior Court Complaint on Monday, January 5, 2015. It is the Tenants' understanding that this Dedham District Court action was filed on January 19, 2015 on a later date. The parties to this case are: Landlord Greystar Management Services, LP; Tenants Andre Bisasor  and Natalie Anderson. The parties to the Norfolk Superior Court Action are: Landlords Andre Bisasor and Natalie Anderson and Tenants Greystar Management Services LP; RAR2 Jefferson at Dedham Station-MA inc. All of the parties to this action are parties to the Norfolk Superior Court Action.

b.   Consequently, as the first-filed action, the Norfolk Superior Court Action should be the venue for the parties' dispute, and this action dismissed or transferred.

c.   The Landlord's choice factor looks to the choice of Landlord in the first-filed action, (see, Holmes Group, 249 F.Supp. 2d at 19) so this factor favors the Norfolk Superior Court Action. The strong presumption in favor of the first-filed Landlord's choice clearly favors dismissal of this case, in favor of the Norfolk Superior Court Action.

### ii.   The Tenants do not Consent to the Dedham District Court Venue

a.   The Tenants do not agree to this case being filed in or remaining in the Dedham District Court. On this basis, the Tenants request that this action be dismissed, or transferred to Norfolk Superior Court for consolidation, under the authority of Superior Court Administrative Directive No. 03-1.

b.   The Tenants would strongly object to transfer of the prior first filed Norfolk Superior Court action to Dedham District Court, for the reasons contained throughout this Motion.

       **iii.**     **There is an improper amount of damages as set forth in the District Court action as set forth in G. L. c. 218, §19.**

         a.   Landlords have set forth amounts requested as $22,260.78. This is based on monthly rent of $2390, monthly late fees of $75, monthly water/sewer charges of an average of $40 over a nine month period.

         b.   Since this action was filed in the month of February and has continued into other months, then another slate of charges will accrue in the amount of $2505, has now made the new minimum total to be claimed by Landlord as $30,000, which is well over the $25,000 minimum for District Court actions.

         c.   On this basis, the Tenants request that this action be dismissed, or transferred to Norfolk Superior Court for consolidation. Furthermore Tenants counterclaim damages will also exceed $25,000 in amounts over $150,000.

       **iv.**     **Tenants need the full discovery process, including depositions, to properly bring and try this case.**

         a.   If this Dedham district court action is allowed, then Tenants will be prevented from the full discovery process that would be accorded in the already previously-filed Norfolk Superior Court action.

   b.  **Conclusion:** For all of the foregoing reasons, venue is appropriate in Norfolk Superior Court. This Dedham District Court action should be dismissed or transferred there for consolidation.

30. **The Tenants have disabilities that are verified and this eviction is the result of a failure to accommodate these disabilities**

   a. Article 114 of the Massachusetts State Constitution prohibits discrimination against or the exclusion of Disabled individuals solely by reason of his or her disability from programs or activity within the Commonwealth.

   b. The Landlord promises its tenants that it will provide a reasonable accommodation to resolve allege violations of tenancy if such violations were the result of any such disability.

   c. The defendants are disabled and any minor or major violations of the Lease Agreement are the result of their disabilities.

   d. Defendants cannot move back to its original unit 3413 because of their disabilities even-though Landlord is trying to force them to move back to their defective unit.

   e. Defendants have requested a permanent alternative unit to move to, so as to accommodate Defendants disabilities. Landlord has refused and this has brought about Landlord's eviction. If Landlord simply accommodated Defendants disabilities, there would be no cause for eviction.

31. **This eviction is in retaliation for raising concerns about bad conditions and about discrimination.**

   a.   Landlords are seeking to terminate tenancy in retaliation after Tenants withheld rent for bad conditions on the premises, after Tenants reported these bad conditions to various local and state officials, after Tenants raised concerns about discrimination and other wrongs, and after Tenants engaged in tenant organizing activity. This complaint should be dismissed.

---

*Defense and Counterclaim*
**Retaliation**
(Mass. Gen. Laws c. 239, §2A; c. 186, §18)

---

32. Defendants re-allege and incorporate all paragraphs above as if fully set forth herein.

33. This defense and counterclaim applies where tenancy is terminated for nonpayment of rent for unit 3413 or without fault for unit 2216.

34. The landlord is trying to evict us and/or retaliate against us because:
    a.  We withheld rent because of bad conditions, and/or told the landlord about bad conditions.
    b.  We reported bad conditions in writing to the landlord.
    c.  We reported bad conditions orally and/or in writing to a public agency.
    d.  We took part in a tenants' meeting or organization.
    e.  We brought a case/claim against the landlord.
    f.  We reserved my right to seek a refund and/or abatement of rent

35. This defense entitles me to possession. Where this is raised as a counterclaim, this entitles me to one to three times the rent or my actual damages, whichever is greater.  We are entitled to a presumption of retaliation because the landlord took action against us within 6 months of any of the above.

36. As a direct and proximate result of Landlord's retaliation, tenant has suffered damages.

37. Tenant is entitled to possession and one to three times the rent or actual damages, whichever is greater.

38. Tenant is entitled to a presumption of retaliation because the landlord took action against tenant within 6 months of the tenant's withholding of rent and/or making complaint about bad conditions and discrimination as follows:

    a.  In 2012, an attempt was made to evict us and cancel our lease immediately after we reported bad conditions of our apartment to the Town of Dedham. When we fought back, we were then charged a $300 rent increase. This again was immediately after we reported our bad conditions of our apartment to the Town of Dedham. This is a prima facie case of retaliation (notwithstanding the more recent and even current attempts at retaliatory eviction and other adverse actions taken against me).  Other examples of retaliation are also provided below under the unfair and deceptive acts section though not an exhaustive list.

    b.  In 2014, subsequent to our complaints to the Town of Dedham and various State agencies regarding the above and other matters, we were and have been subjected to multiple attempts at retaliation by Jefferson. Jefferson has expressed anger on several occasions that we made these complaints. After raising certain of our concerns, particularly those related to discrimination as well as the bad conditions among other things, we were told that we should consider going to live somewhere else. Since we raised these concerns, there was also a substantial change in how we were treated by Jefferson including but not limited to cold shoulders, unwelcoming/angry attitudes, being ignored in the front office, having certain

maintenance requests for our alternative unit delayed, refusal by property managers to meet with us in the front office and handing us off to only deal with leasing staff, being subjected to defamatory comments made to other tenants and external parties about us, disclosures to third parties about our rent situation which is against FDCPA laws, shutting off utilities in our alternative unit more than once, harassing actions including attempts to enter our unit without us present, retaliatory rent increases, threats of eviction and actual attempts at eviction, etc, and even most recently, the reneging of promises including refusal to offer settlement because of retaliation and other bad faith actions as well as bad faith denial of reasonable accommodations requests. I could go on (please see attached 93A demand letter). The upper management of Greystar and RREEF has allowed his retaliation to occur and have failed to act to prevent retaliation from occurring, even-though several attempts were made to appeal to upper management and the board of directors for intervention. This failure to act impugns the entire organization from top to bottom and invites a cause for punitive damages. These actions and inactions have been outrageous and reckless and society has an interest in rooting out willful and illegal retaliation in fair housing matters.

39. After raising concerns, Tenants were told that they should consider going to live somewhere else. There was also a substantial change in how Tenants were treated by Landlord including but not limited to:

a. Ms. Donahue abruptly left the meeting on May 6, 2014 while being visibly upset after meeting with Tenants on May 6 after Tenants brought complaints to her attention in person. During that meeting Ms. Donahue agreed to show Tenants the temp unit available (after we raised concerns about being previously denied a tour of the temp unit being offered to Tenants) but then after Tenant brought complaints to her attention in person including racial discrimination and the attendant emotional distress, all of a sudden for no real or apparent reason that she canceled a tour with Tenant of the temp unit (after huddling with Ms. McNeely). Ms. Donahue in fact started to the exit the office without saying goodbye to Tenants and it was only after Tenant Anderson gazed at her in amazement that she was leaving without saying goodbye that she stopped her exit, turned back to say a stilted goodbye.

b. Ms. McNeely has essentially avoided meeting with Tenants in person after Tenants raised concerns about how Tenants were being treated. In fact, all of a sudden, Ms. McNeely seemed to find new reasons to not be the person to meet with Tenants, including that she is leaving the office early or that she will not be in the office or otherwise all of sudden dispatching Mark to meet with Tenants ever since May 7 and 8, 2014. It seems evident that Ms. McNeely has wanted to limit her interaction with Tenants in person.

c. Also, Operations Manager Chris Esmond has avoided contact with Tenants in the office, not acknowledging or addressing us (i.e. not saying hello, while doing so with other tenants) or assisting Tenants when Tenants goes to the office while saying hello and assisting other tenants. It seemed evident that Mr. Esmond did not want to interact with Tenants in person particularly as it relates to the day of the May 7, 2014 meeting.

d. There was also an attempt to evict Tenants again two days after Tenant brought these complaints to Landlords attention in person in a meeting on May 6, 2014.

e. Landlords engaged in bad faith actions that led Tenants to believe Landlords were working on compensation and rent abatement while at the same time they were instead trying to evict Tenants and then later denied any compensation or rent abatement when Landlords said they were working on it.

f.  Notwithstanding promises to settle and resolve these issues but yet failing to follow through on these promises, Landlords have threatened and continue to threaten to evict Tenants including issuing a number of notices to quit to Tenant sand threatening court action every so often.

g.  Landlords have also shut-off or cause to shut-off utilities in alternative unit that Landlords agreed to pay for. Landlords have created roadblocks to Tenants operating or getting customer service for utilities by blocking Landlords from speaking about the account. Landlords have, in this and other ways, made it uncomfortable for Tenants to remain in alternative unit 2216.

h.  Landlords have allowed the bed problem, the couch problem and other problems to remain unaddressed in alternative unit 2216.

i.  On a prior occasion, in March of 2012, there was an attempt to evict Tenants after Tenants reported bad conditions to the Town of Dedham. Landlords filed a malicious and frivolous summary process action in Dedham District Court, even-though Landlord knew that Tenants had been paying rent or that there was an agreement by prior management to accept rent at a certain time of the month each month.

j.  This summary process was dismissed because Landlord eventually had to acknowledge payment before the entry date but nonetheless the eviction action is still noted on Tenant's record, causing tremendous damage and resulting in possible future blacklisting by other landlords based on modern tenant screening methods that will likely identify the dismissed and unwarranted eviction action.

k.  Tenants have paid rent every month for several years without incident since the inception of tenancy in July 2008.

l.  In September of 2012, rents were increased by $300 after Tenant reported bad conditions to the Town of Dedham.

m.  Upper management of Greystar have allowed his retaliation to occur and have failed to act to prevent retaliation from occurring, even-though several attempts were made to appeal to upper management and the board of directors for intervention. This failure to act impugns the entire organization from top to bottom and invites a cause for punitive damages. Landlords' actions and inactions have therefore been exhibited outrageous and reckless conduct. Society has an interest in rooting out willful and illegal retaliation in fair housing matters and the Landlords are likely to continue such repugnant behavior without a finding for punitive damages.

n.  Plaintiffs, through the acts and omissions described above, *inter alia,* retaliated against Defendants for exercising rights protected by both federal and state law.

o.  Plaintiffs, through the acts and omissions described above, inter alia, aided, abetted, incited, compelled and/or coerced others to retaliate unlawfully against Defendants, or attempted to do so, in violation of both federal and state law.

p.  As a direct and proximate result of Plaintiffs' retaliation, Defendants has suffered damages.

q.  Defendants are entitled to a presumption of retaliation because Plaintiffs took action against Defendants with 6 months of Defendants' asserting his legal rights.

r.  As a result of Plaintiffs' retaliatory conduct, Defendants have suffered and will continue to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

*Defense and Counterclaim*
**Discrimination (Race and Disability)**
(Mass. Gen. Laws c. 239;  Mass. Gen. Laws c. 151B;  Federal Fair Housing Act; Americans With Disabilities
Act; and/or Section 504 of the Rehabilitation Act)

40. Defendants re-allege and incorporate all paragraphs above as if fully set forth herein.

41. This defense and counterclaim applies where tenancy is terminated for nonpayment of rent for unit 3413 and without fault for unit 2216. Our landlords have discriminated against us based on: Race and Disability

42. We have physical disabilities and the landlord has failed to make reasonable accommodation(s) for the disabilities.

43. We have physical disabilities and we are requesting reasonable accommodation(s).

## DISCRIMINATION & HARASSMENT BASED ON DISABILITY

44. Jefferson has refused to allow us to move from our unit permanently even though we have asked for several months and even though we produced medical documentation of basis for this request. Instead Jefferson has conditioned a move upon payment of all back rent for an apartment that was uninhabitable and that we did not live in (at least for the time period when the elevator was broken i.e. for 6 months and more, due to the structural and other problems with unit 3413). Even assuming arguendo that rent was not waived which it was, or that the warranty of habitability did not apply, which is does, the fact that Jefferson wants to charge us full rent for our original unit two bedroom apartment when we were in an alternative unit one bedroom apartment for several months, defies all bounds of reason, logic and fairness. To condition our move to another unit upon paying all back rent without settlement is tantamount to extortion. Jefferson is placing us in a position where in order to get relief for our disabilities and medical conditions we must give up our rights regarding the issues of settlement and simply pay all back rent, no questions asked; otherwise we are stuck in the defective unit unable to move permanently. Yet they don't want to have a structural evaluation of our original unit in order to do a permanent and proper fix to the long-time problems of cracking etc. This is the heights of unfairness and abuse of power.

45. Landlord has engaged in the Denial of Reasonable Accommodation/Disability Discrimination as follows:

    a. The reappearing of old cracks and the development of new cracks will subject the apartment to entry of insects and bugs which have plagued the apartment in the past. By allowing the problems to continue, Landlords have and are interfering with Tenant's right to quiet enjoyment of the unit.

    b. Increased exposure to insects and bugs will endanger the health, safety and wellbeing of Tenant's wife due to her sensitive skin allergy condition.

    c. Increased exposure to dust and debris from cracking, chipping and separations/holes in the ceiling and walls of the apartment and the continual need to have the apartment plastered, re-plastered,

repainted and undergo construction work will endanger the health, safety and wellbeing of Tenant's wife due to her breathing allergy/asthmatic condition. By allowing this situation to continue, Landlords have and are interfering with Tenant's right to quiet enjoyment of the unit and have discriminated against Tenant based on her disabilities.

d.   The Building Commissioner of Dedham told Tenant Anderson that she should not remain in the apartment prior to/during construction repair work for the cracks because of her asthma condition.

e.   Therefore a temporary cosmetic cover up of the cracks will directly impact the ability of Tenant Anderson to enjoy the dwelling as it will pose a threat to her health, safety and wellbeing.

f.   If Landlord is allowed to cosmetically cover up the cracks while denying access to a structural engineer's evaluation, it will cause irreparable harm to Tenant and his wife.

g.   By failing to secure a structural evaluation, Landlord has therefore failed to accommodate the disabilities of Tenant Anderson.

h.   Tenants have explicitly asked Landlords to make a reasonable accommodation of Tenant Anderson's disabilities by securing the structural evaluation and permanently fixing the cracks. Landlords have repeatedly refused.

i.   Tenants have repeatedly asked for a transfer to a permanent alternative unit as a reasonable accommodation for Tenant Anderson's disabilities. Landlords have repeatedly refused.

j.   Tenants have been harmed by these actions and will suffer irreparable harm. If Landlords do a cosmetic cover-up of the cracks while refusing to do a proper structural evaluation of the cracks in the apartment, this will cause substantial damage to Tenants as this will deprive Tenants the right and opportunity to have an engineer evaluate the problems in the apartment and this could substantially prejudice their rights. Tenants have the right to appeal to the State to make a final ruling on this matter. The Board of Building Regulations is the highest governing authority of the State that has purview and oversight over these matters. Tenant Bisasor was told by the Massachusetts Department of Public Safety (MDPS) that he has the right to file a hearing before the Board of Building Regulations, as the MDPS has declared that our unit should not be excluded from the structural evaluation. Tenant Bisasor initiated the State Board of Appeals process.

k.   Tenants has contacted Landlords on several occasions (including in the months of November and December of 2014 as well as most recently on January 2 and January 5 of 2015) to request reasonable accommodations and to resolve these issues but to no avail.

l.   Landlords continue to threaten and harass Tenants, by attempting to enter Tenants' unit in a non-peaceable manner, over Tenants' objection, spurring on a physical confrontation between Landlord and Tenants at Tenants' door. This has caused much emotional distress for Tenants. This is also a breach of the lease.

46.  Landlords have therefore violated Massachusetts disability laws (G.L. 151B) and has discriminated against Tenants based on their disabilities.

47.   Plaintiffs, through the acts and omissions described above, *inter alia*, has aided, abetted, incited, compelled and/or coerced others into discriminating unlawfully against Defendants because of his wife's disability, or attempted to do so, in violation of both federal and state law.

48.   As a result of Plaintiffs' discriminatory conduct, Defendants has suffered and continues to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

*RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, (42
U.S.C. § 3601, ET. SEQ. ) AND IN VIOLATION OF CIVIL RIGHTS ACT OF 1866, (42 U.S.C.
§§ 1981 AND 1982)*

## RACIAL DISCRIMINATION PROBLEMS

49. Defendants re-allege and incorporate all paragraphs above as if fully set forth herein.

50. We are black tenants and we are one of the few black families that still live in this apartment complex. We have lived here since 2008 and have paid rent every month until the elevators broke down where we could not traverse over 80 stairs/four floors on the top floor due to our medical conditions. We were denied reasonable accommodation by Jefferson while at the same time Jefferson was offering accommodations to white tenants. We have several tenants willing to testify that they were told the opposite of what we were told thereby proving not only a denial of reasonable accommodation pursuant to our medical disabilities but also racial discrimination (i.e. we as black tenants were not deserving of relief from our pain and harm due to the broken elevators but other non-black tenants were so deserving as determined by Jefferson management). The explanation later offered by management was that they did not take our medical issues seriously because we look healthy and don't have a walker or wheelchair. The explanation later changed to the idea that they did not know that they could offer accommodations to us. These changing explanations further demonstrate pretext and the intent to discriminate. To compound the problem, Jefferson management tried to cover up the problem instead of holding wrongdoers accountable. Further, what ensued next was a series of attempts to manipulate us, deceive us and trick us and bait and switch us. It was only after going to the Town of Dedham to inquire about these issues did we find out that Jefferson management already told town officials that Jefferson offered hotel accommodations to any tenant that needs it and that they announced this to all tenants. The Town of Dedham building commissioner was shocked that this in fact had not occurred because he and other town officials were led to believe otherwise and were placated as a result. Jefferson finally reversed course and moved us to a temporary unit on a lower floor in another building on the property. After about month or so, of having to traverse stairs, our medical conditions were worsened and exacerbated.

51. When we finally were displaced to a temporary unit, we were given sub-par, cheap, inadequate furniture which caused injury to our back and neck. We have pleaded with Jefferson to address the furniture problem but they have only given excuses or otherwise lied about the matter. For example, they never addressed the sunken couch problem that causes pain to us when using it, and have refused to replace the shaky unstable bed which have caused the onset of back and neck injuries for which we have had to seek medical treatment and incurred thousands of dollars worth of medical bills. When we asked for assistance with moving our furniture we were rebuffed and when we agreed to have our bed moved by them, we were told that if they damaged our bed they would not pay for it and thus refused to move our own bed from our original apartment. When they finally promised to replace the bed from a local vendor, they took forever to do so until they ran out the clock for almost 6 months and they just plain refused to replace the bed even-though they previously promised to do so. Recently, they lied in a recent email saying they already replaced the whole bed and that they thought the matter was resolved, which is a lie and the email evidence proves this is a lie.

52. The Dedham Building Commissioner told Tenant Anderson to stay in the temporary unit until the structural cracks are fixed because of her medical issues. Jefferson has not fixed the problems with the cracks in our original unit because they want to avoid doing a structural evaluation of our unit in order to determine why it is cracking so much.

53. In addition, when the issue of accommodation was finally addressed, Jefferson management sought to steer US to a particular unit. They did this in several ways by placing pressure tactics on us and making us think that it would take much longer to get other Units ready. They also told us no other units were available when in fact many other units were available.  We were steered to the worst unit on a floor

with mostly blacks. We have statistical evidence of this. We also later found out that certain other available units were given to white couples. After doing some tenant organizing work, we found out that we were charged $300 to $400 more in rent than white tenants for comparable units and that this was true for other black tenants we spoke to. Also, Jefferson was willing to negotiate with white tenants but unwilling to negotiate with black tenants.

54. Jefferson has discriminated against us in other ways as summarized and described below. Jefferson has engaged in racial discrimination and denial of reasonable accommodation as follows:

### a. Denial of Reasonable Accommodation & Racial Discrimination:

    i. We reside on the top floor and both of us have documented medical conditions that make it difficult to traverse 4 long flights of stairs multiple times a day each day.

    ii. On at least two separate occasions in April, we (as black tenants) were denied access to reasonable accommodations for our medical conditions while at or around the same time, other white tenants were offered accommodations for their medical conditions.

    iii. We believe this was due to discrimination based on race since management was put on notice at least twice that we needed accommodations and we were denied or told that no accommodations were available.

    iv. It was only after Tenant Anderson complained to the Town of Dedham that Jefferson reversed course and offered us accommodations.

    v. Yet even the offer of accommodations was replete with changing conditions and terms, making it difficult to know what was really being offered.

    vi. NB: It is without dispute that Jefferson told us that there were no accommodations available at the same time that they offered other white tenants accommodations due to the broken elevators.

### b. Illegal Racial Steering & Discrimination

    i. We were discriminated against by Jefferson management in steering us to certain specific alternative units, while lying to us about the availability of other vacant units.

    ii. The alternative unit that we were steered to is located on a certain wing/floor of building 2, comprised almost entirely by minorities/blacks.

    iii. This unit is literally surrounded by black tenants on every side and the rest of the wing is largely comprised of non-white tenants.

    iv. At or around the same time that we were being steered to this alternative unit, there was another unit (a larger more comparable unit to our original unit in building 3) that was available on the opposite wing on the other side of that same building 2 that we were not told about, and later a white couple was given that unit, though we were denied housing relative to that same other unit.

    v. Jefferson has thus made certain rental units unavailable to us.

### c. Discriminatory and Disparate Treatment Based on Race in Rents for Comparable Units

    i. Jefferson has also engaged in discriminatory rents in charging different rents to black and white tenants.

    ii. Jefferson has charged "unsubsidized" black tenants more in rent (in some cases several hundred dollars more) for the same type or category of unit than they charge white tenants. Jefferson has also allowed more concessions in rent for white tenants than for such black tenants.

    iii. Jefferson substantially has raised rents for black tenants when it comes time for lease renewal and refuse to engage in negotiation in order to keep black tenants as residents, to the dismay of black tenants, while at the same time, Jefferson show substantial

leeway in negotiating lease renewals with white tenants to the satisfaction of white
tenants, in order to keep white tenants as residents.

iv.   **Here is an example of the Landlord charging disparate rents to me versus other
tenants who happen to be white.**

> Date: Sun, Jul 27, 2014 at 12:02 PM
> Subject: Re: Initial Contact-Update / Tenants' Group For Jefferson-
> Dedham Residents
> To: Jefferson-Dedham Tenant <  jeffersondedhamtenant@gmail.com >
>
> So our initial rent was $2027 per month, which was great but the huge
> increase was just too much. We sent a formal notice of intent to vacate
> and the same day they came down $350 from the original price, but we
> had already committed to another place. We didn't really have too many
> other qualms
>
> Sent from my iPhone

This is an email from a white tenant who was in a comparable unit to our unit. I
can provide original clean copies of emails upon request. This email shows that we
were charged $300 more in rent that this white tenant for the same unit   (our rent
for the same time period was $2320).  This email  also shows significant
concessions made to this tenant when it came time for lease renewal i.e. a $350
decrease in rent concession, in order to keep them as tenants. This kind of
concession has never been offered to us for the same comparable unit. This
establishes a prima facie case of racial discrimination which I have been screaming
to you all and telling you all that this is going on. I have other evidence from other
white tenants and black tenants that show that this is a pattern of discrimination
going on.

**d. Disparate treatment based on race in charging of application fees.**
   i.   We were charged application fees for moving in, when the immediate white couple
        before us that was in our unit was not charged application fees.
   j.   This is a prima facie case of discrimination based on race. Why would it ever be
        acceptable to charge me application fees but not charge white tenants similarly situated
        the same application fees?

**e. Hostile Environment for Black Tenants and Predatory/Discriminatory Rent Increases
and/or Constructive Eviction Attempts:**

   i.    On information and belief, Jefferson has been engaging in attempts to evict black
         tenants i.e. targeted evictions of blacks and a pattern of discrimination in trying to evict
         black tenants, who have to get lawyers and spend time and money fighting eviction.
   ii.   There has been a pattern of mistreatment and hostile treatment of minorities/other
         minorities mistreated.
   iii.  Jefferson has expressed frustration or allowed other white tenants to express
         frustration over certain black tenants using the pool.
   iv.   This has had the effect of causing some black tenants to not feel welcome in the pool
         area.
   v.    Jefferson has told certain black tenants that they are not welcome to attend the board
         of elevators hearing in July 2014, even-though Jefferson knew that the Board of
         Elevator meeting is open to the general public.

vi.  Jefferson has had a number of complaints lodged by minority tenants against them, especially as it relates to how they are being treated by management.

vii.  Jefferson is using high rent increase to get people of color out of the property.

viii.  There have been systemic attempts at constructive eviction by imposing significant rent increases.

ix.  Jefferson has in other ways allowed or facilitated systemic patterns of racial discrimination to take place as follows:

    a.  they have engaged in a gentrification pattern of discrimination.

    b.  There are attempts to remove as many black tenants as possible by engaging in severely high rent increases.

    c.  There has been a concerted effort to target black tenants for eviction i.e. systemic discrimination to target blacks to move out.

    d.  Jefferson has also allowed or engaged in systemic racial discrimination at the upper management level of the corporation.

    e.  Blacks are conspicuously missing from the ranks of board of directors, top executives, senior managing directors, regional directors, regional property or property managers.

    f.  The only positions that blacks are allowed to have are largely lower-level positions either as maintenance or janitorial staff or otherwise leasing staff.

    g.  On information and belief, this utter lack of diversity filters down into the culture of the organization and affects how black tenants are treated.

vi.  [NB: Please note that gentrification is a problem in housing in the US. Even if not pursued consciously there is still a disparate impact on black minority tenants. It destroys lives and uproots familial and social structures. Care needs to be taken to ensure that the Landlord is not employing a gentrification strategy. Black tenants that have been here for several years should not be exposed to $1000 increases in rent, with the clear inevitable logical result that they will be evicted.  Jefferson has raised our rents by almost $1000 and they have issued us as well as other black tenant rent increases in the $300 or more range. Then, they turn right around and evict. This is unfair to black tenants who already are the most vulnerable social-economic group in the US.]

55.  Defendants' unit is a dwelling as defined by 42 U.S.C. § 3602 (b). Landlords own the property that Defendants rent the dwelling.

56.  Defendants are African-American and are members of a protected class under 42 U.S.C. § 8 3604 (a), (b) and (d).

57.  Landlord has discriminated against Tenant because of their race and conspired to interfere with Tenants civil rights to equal access to housing and housing opportunities.

58.  They have discriminated against Tenants because of their race, in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601, et. seq., and in violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982 a have acted intentionally, willfully, and with reckless disregard for Tenants' federally protected civil rights.

59.  As a result of the Landlords' actions, Tenants have suffered and are continuing to suffer great harm and injury, including but not limited to economic loss, humiliation, embarrassment, emotional distress, mental anguish, stress, depression, and the deprivation of the right to housing on an equal basis with other persons regardless of race.

60.  Because Landlords have acted intentionally, willfully, and with reckless disregard for Tenant's civil rights, as a result, Tenant is entitled to actual and punitive damages in an amount to be determined at trial.

61.     Plaintiffs' actions constitute a pattern of repeated harassment and indirect threats to Defendants which were designed and committed to interfere with Defendants' civil rights.

62.     Plaintiffs' actions interfered with Defendants' civil rights to equal housing and equal housing opportunities without discrimination.

63.     Plaintiffs, through the acts and omissions described above, *inter alia*, has aided, abetted, incited, compelled and/or coerced others into discriminating unlawfully against Defendants because of his race, or attempted to do so, in violation of both federal and state law.

64.     As a result of Plaintiffs' discriminatory conduct, Defendants has suffered and continues to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

65.     Plaintiffs have acted intentionally, willfully, and with reckless disregard for Defendants' civil rights, and as a result, Defendants is entitled to actual and punitive damages in an amount to be determined at trial.

---

## *Defense and Counter Claim*
### Breach of Warranty of Habitability/Bad Conditions in My Home, Breach of Contract and Other Claims
(Mass. Gen. Laws c. 239, §8A; c. 93A; and/or Implied Warranty of Habitability)

---

66. Defendants re-allege and incorporate all paragraphs above as if fully set forth herein.

67. We have a defense because of past or present problems in or around our home that the landlord knew or should have known about, including but not limited to the following:
   a.   Defective ceilings, walls, or floors
   b.   Defective windows and doors
   c.   Insects and other pests
   d.   Non-working dishwasher
   e.   Water entry/flooding
   f.   Problems with heat
   g.   Defective locks or security problems
   h.   Mold/moldy Smell

68. The landlord knew or should have known about the bad conditions because:
   a.   We told the landlord orally.
   b.   We told the landlord in writing.
   c.   The landlord was notified by the local Board of Health and Building Department.
   d.   All or some of the conditions existed when we moved in.
   e.   All or some of the conditions existed when the landlord purchased the property.

69. As a counterclaim, we are entitled to damages for the reduced value of our home, calculated as the difference between: (a) the full market rental value of our apartment in good condition, and (b) the reduced value of our apartment in its bad condition. We are also entitled to damages for any other losses, injuries, or expenses resulting from bad conditions.

70. Over the past 7 years, tenants have paid approximately $140,000 in rent. Total amount to be discounted for breach of warranty of habitability/bad conditions is approximately $30,000 based on conservative assumptions. Total amount to be discounted based on broken elevator and structural problems in 2014 and therefore having to be displaced from May 2014 until April 2014 (12 months) is approx. 10,000.

Therefore based on bad conditions alone, tenants are entitled to $40,000. This is not taking into account other problems such as problems with heat, lock/security problems, and water entry/flooding.

## EXCURSUS ON STRUCTURAL PROBLEMS

71. Another key issue relates to the structural problems with the property.

72. There are significant signs of structural stress in our apartment unit including cracks, door jamming, window jamming, bungling in the floor/carpet, water-leaks during inclement weather, and other problems. These are major signs of structural problems. When we brought these issues to the attention of management, they have refused to do a structural evaluation of our unit. Instead they resorted to deception and subterfuge to avoid having an independent structural evaluation of our unit by a certified expert. It puzzled me for a long time as to why Jefferson would go to such lengths to avoid doing a simple structural evaluation of our unit. But after reading the SEC filing disclosures, it made sense…there is a powerful financial incentive that transcends the cost of simply fixing the structural issues (which by itself requires significant financial outlay) but it also goes to the heart of the investment value of the portfolio properties which could result in millions of dollars worth of loss. It could also trigger legal action from REIT investors. This suggests that there is a powerful incentive to avoid finding a structural problem with the bank's portfolio properties because if there is a material structural event, then this could cause a re-pricing of the value of the property and could result in significant losses for investors in the REIT.

73. Inotherwords, it is likely that the investment portfolio of the RREEF trust/REIT would not only suffer the cost of having to dig beneath the road and concrete to address the structural problem but any devaluation of property due to the declaration of a structural problem would potentially cost the REIT millions in terms of the ripple effect in the portfolio holdings. These asset managers/property managers have a built-in incentive to lie about there being a structural problem because that is a multimillion dollar problem. Unfortunately, the REIT has a responsibility to ensure public safety and public trust. It cannot sacrifice tenant safety for profits, as this is unethical greed/profiteering similar to companies that don't want to clean up the toxic waste it produces that put communities at risk.

74. So we have asked for almost 8 months for an investigation into this structural problem. We also asked for an independent evaluation by a new firm and that they don't signal that they want a certain result but make it abundantly clear that they want the unvarnished truth about the structural issues and nothing but the truth. We requested that the engineering firm, Simpson Gumpertz and Heger ("Simpson"), be excluded and a new independent firm should be brought in because Simpson has lied on behalf of Jefferson in the past and we have video-tape evidence to prove it. Simpson has skirted the truth to please its unethical client, and this, we believe, has been done at the behest of Jefferson (i.e. Think about how Andersen consulting did what its client wanted and how that led to the Enron debacle). Simpson knows that Jefferson does not want to have a structural problem. Jefferson fought tooth and nail to avoid a finding that would require the elevator be replaced, when the State found that there was cracking in the pit wall concrete of the elevator shaft and thereby condemned the elevator due to a concern for catastrophic failure.

75. The State gave the directive to Jefferson to replace the elevators but Jefferson made appeal after appeal to avoid doing so and engaged Simpson to testify at an appeals hearing in order to persuade the State that there was no structural problem with the building that would require a replacement of the elevators and to persuade the State to allow them to make certain patch up repairs instead (by the way, even to this day, the elevator is still making bumping behaviors and making strange noises and we are concerned that the elevator might not be fully safe but that is another story that I will leave alone for now). Presumably this was to avoid paying the heavy cost involved with having to install 3 new elevators in at least two buildings. Simpson lied to the board of elevators on July 22, 2014 telling them they were no other cracks anywhere in the building and that if they had found any signs of cracking or stress in the building, they would change their recommendation and testimony. Jefferson stood there

and allowed Simpson to lie under oath to the board of elevators. It is unbelievable that Simpson did not know about the cracks in units throughout the building because Jefferson has known about them since 2008. Furthermore, there is no way an honest engineer could testify under oath that it found no signs of cracks or stress anywhere else in the building when it either did not do an inspection of the rest of the building or it did so and found the many cracks that are pervasive in the common areas on each floor of the building. I have all of this on videotape for you to review. Simpson is therefore compromised.

76. Furthermore, Jefferson used deception to avoid following the directive by the Town of Dedham to do a structural evaluation of our unit. Jefferson lied to us about the dates that the engineers would come to evaluate our unit, thereby causing our unit to not be evaluated but instead only the common areas. We have email records that prove this deception and manipulation by Jefferson to utterly avoid evaluating our unit. Simpson thus made a report without our unit and, as you might guess, they found no structural problems, even though Simpson knew that our unit was required to be evaluated and even though Simpson knew that our unit had pervasive cracking and signs of stress pursuant to our complaints to the Town and to Jefferson.

## *MORE ON BREACH OF IMPLIED WARRANTY OF HABITABILITY*

77.    Defendants and Plaintiffs were parties to leases whereby Plaintiffs provided dwelling to Defendants in exchange for Defendants' payment of rent.

78.    There is an implied warranty of habitability and fitness for intended use in all residential leases.

79.    Plaintiffs have engaged in a breach of the warranty of habitability and the sanitation code, including but not limited to the following:

   a.  This includes the broken elevator situation whereby the elevator in Building 3 of the complex was broken or in need of repair for approx. nine months. The broken elevator in building 3 violated the provision of the state sanitation code that calls for proper maintenance of exits and of elements vital to the use of the property. Since the elevator is necessary to the exit of the building particularly for those (like the Defendants) that have medical conditions that make it difficult to traverse stairs from the fourth/top floor, then this constituted a violation of the state sanitation code.  The Town of Dedham confirmed this by issuing Plaintiffs a directive to make alternative accommodations for tenants, especially for those who have medical or other conditions that make it difficult to traverse several flights of stairs.

   b.  The lack of proper maintenance of Defendants' apartment 3413 as it relates to the recurring cracks in the ceiling of the bedroom and the kitchen and throughout the apartment, which is susceptible to insect penetration. These recurring cracks in the ceiling appear to be related to the same structural problems in Building 3 that caused the issues with the elevator.  These recurring ceiling cracks have not been fixed despite repeated requests and despite several visits by maintenance staff persons who have not made these repairs. Also, in the past, the Dedham Board of Health issued a finding of a breach as it relates to this very issue and has previously ordered that this be fixed. The Town of Dedham has found that this is a violation of the state sanitation code.

80.    The conditions described above breached the implied warranty of habitability and fitness for intended use.

81.    On or about April 2014, the elevators in Defendants' apartment complex stopped working. The Massachusetts Department of Public Safety cited the complex because of cracks in the pit floor concrete to/of the elevators.

82.     Defendants have leg/feet problems that make going up and down the stairs difficult and painful,
exacerbating/worsening his medical condition.

83.     Defendants knew about the elevator problem because the Plaintiffs informed them in writing and
were notified by the Department of Public Safety.

84.     Plaintiffs have also engaged in Breach of Warranty of Habitability and Violation of State Sanitation
Code as follows:

     a.     Plaintiffs have known about cracks in Defendants' apartment since around 2008. These
cracks have expanded and gotten worse over time.

     b.     These cracks are widespread, extensive and pervasive. There are cracks of all types and
sizes. There are diagonal cracks, vertical cracks, and horizontal cracks. There are long cracks, short
cracks, and multiple cracks in the same area as well as throughout the apartment. There are cracks
in the ceiling and on the walls on the window areas, on the lower part of the walls, on the upper
part of the walls, on the wall area on/over the kitchen counter, over the kitchen sink, over the
AC unit, over doors, next to closet spaces, under windows and above windows. There are also
cracks in every room and on almost every wall in the apartment. There are over 20 cracks in the
apartment. The apartment is clearly in a deteriorating condition and it is continually breaking with
new cracks appearing every few months including loose debris of chips or pieces of the ceiling
falling on Defendants' bed, in the kitchen and elsewhere in the apartment.  Also, the doors in the
apartment are or have been jamming and are difficult to close or open. Several windows are or have
been jamming and are difficult to open or close. There is also buckling/bunching in the
carpet/floor and there is displacement of the kitchen tiles, which indicates further signs of stress in
the floor as well. This is clear evidence that the entire apartment is under significant stress and
structural siege. These are the hallmarks of a structural safety and integrity problem which any
reasonable person would be or should be concerned about.

     c.     Plaintiffs have sought to hide the existence of these cracks in Defendants' unit (and
throughout the building) from Massachusetts Department of Public Safety/State  officials  and
have presented inaccurate and misleading information to the State regarding the existence of cracks
in the building (saying there were none) during a Board of Elevators meeting in July 2014. These
misrepresentations were made to the State in order to get approval on a variance request to avoid
the costs of replacing the broken elevators that were condemned by the State  in April 2014
because of concerns by the State about catastrophic failure and because of cracking and stress in
the building shaft and foundations for the elevator.

     d.     Plaintiffs have refused to fix these cracks in Defendants' unit since 2008 or 2009 until 2012
until Defendants was forced to contact the Town of Dedham in 2012.  The Town of Dedham
issued a citation against Plaintiffs in summer of 2012. Plaintiffs attempted a cosmetic cover-up
repair in summer of 2012 but did not provide a permanent or adequate repair. Cracks reappeared
shortly thereafter. Plaintiffs have been aware of the continual problems with these cracks.

     e.     Again in July of 2013 and February of 2014, Defendants had formally apprised Plaintiffs of
the persistence of these cracks and continued to request repairs on several occasions but Plaintiffs
have refused or neglected to make repairs.

     f.     In October and November 2014, the Town of Dedham issued new citations for these
cracks. On information and belief, in or around December 2014, the Town of Dedham ordered
Plaintiffs to conduct a structural evaluation (as it relates to the cracks, etc) of the building 3,
including Defendants' unit, by a certified expert.

g.      Plaintiffs deceived Defendants regarding the dates that such a structural evaluation would take place in order to exclude Defendants' unit from the structural evaluation.

h.      Defendants have since been requesting that the unit be included in the structural evaluation. Plaintiffs have refused to do so, claiming that they changed their mind and that it is not needed.

i.      Defendants have asked the Massachusetts Department of Public Health and the Massachusetts Department of Public Safety for guidance and these State bodies have stated that Defendants' unit should not be excluded from the structural evaluation.  The Massachusetts Department of Public Safety also told Defendants that Defendants should file an administrative action/request a formal administrative hearing with the State Board of Building Regulations to also review and rule on the matter.

j.      Defendants have apprised Plaintiffs of the position of Massachusetts Department of Public Health and the Massachusetts Department of Public Safety and of Defendants intent to seek administrative hearing on the matter.

k.      Plaintiffs have still refused to have Defendants' unit structurally evaluated.

l.      One of the Defendants has medical conditions that render the unit a health hazard. Plaintiffs have been aware of these medical conditions but have refused reasonable accommodations for this Defendant.

m.      By failing to provide a structural evaluation of Defendants' unit, Plaintiffs have failed to ascertain the causes and the exact nature of the widespread and extensive cracks in Defendants' unit.

n.      By failing to ascertain the exact nature of the cracks in the unit, Plaintiffs are not able to determine what needs to be done to permanently and adequately repair the cracks.

o.      Upon information and belief, Plaintiffs plan to enact a temporary cosmetic cover-up of the cracks. Plaintiffs made a similar temporary patch-up job in 2012 which re-cracked shortly thereafter. Plaintiffs have recently refused, though asked to do so on several occasions, to inform Defendants of what it will do to permanently/adequately fix the cracks.

p.      Plaintiffs has gone to great lengths to deceive Defendants regarding its intention to fix the cracks including lying about the reasons why it failed to fix the cracks on previous occasions when Defendants provided access for maintenance repairs and lying about the dates on which structural engineers would do a structural evaluation in order to create the impression that Defendants denied access for the engineer's inspection. Defendants provided access for inspection/evaluation by the engineers on December 5, December 12, December 18 and December 19 of 2014 but Plaintiffs have repeatedly refused to provide the engineers to conduct the evaluation. As a result of the above, among other things, Plaintiffs have engaged in unfair and deceptive practices.

q.      Plaintiffs are determined to exclude Defendants' unit from being structurally evaluated in order to avoid a finding that Defendants' unit is structurally deficient and to avoid the costs involved with providing a permanent, long-term and adequate repair of the problems with the apartment. Plaintiffs are determined to provide only a temporary, superficial, cosmetic cover-up of the problems. By doing a temporary cover-up of the cracks and not addressing the true underlying problems causing the cracks, the cracks will reappear, continue to expand and get worse. This is a violation of the state building code, the state sanitation code and the warranty of habitability.

85.     Defendants have been injured by Plaintiffs' breach of implied warranty of habitability and fitness for intended use in an amount to be proven at trial.

86.     Defendants is also entitled to total or partial abatement of past and future rent, declaratory relief, injunctive relief, and attorney's fees as a result of Plaintiffs' breach of the implied warranty of habitability and fitness for intended use.

87.     Defendants are entitled to damages for any other losses, injuries, or expenses resulting from bad conditions.

88.     Defendants is entitled to statutory damages for each violation or actual damages and doubled or trebled because Plaintiffs conduct was willful and knowing, whichever is greater.

---

### *Defense & Counterclaim*
### Breach of Quiet Enjoyment (Interference with Utilities/Use of Home)
#### (Mass. Gen. Laws c. 239, §8A; c. 186, §14; and/or c. 93A)

---

89.  The landlord did the following:
    a.   Did not provide adequate heat.
    b.   Did not pay for utilities that were the landlord's responsibility and allowed the shut off of our utilities.
    c.   Allowed bad conditions to exist in our apartment.
    d.   Entered my apartment without my permission.
    e.   Interfered with my right to enjoy my home
    f.   On information and belief, we have been billed for water that goes to other people's apartments or common areas.

90.  We hereby incorporate the breach of warranty of habitability section herein.

91.  This defense and counterclaim entitles me to damages under G.L. c. 186, §14, and/or c. 93A. .

92.  This defense and counterclaim entitles us to three times the rent or my actual damages, whichever is greater

## MORE ON BREACH OF COVENANT OF QUIET ENJOYMENT

93.     Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

94.     Defendants' tenancy carried with it an implied covenant of quiet enjoyment and peaceable possession of the unit during the terms of the lease.

95.     Plaintiffs breached Defendants' right to quiet enjoyment and possession of the unit by attempting to harass, bully, intimidate and threaten Defendants.

96.     Plaintiffs have engaged in breach of the covenant of quiet enjoyment including but not limited to the following:

a. There is a breach of quiet enjoyment given that Defendants has not had the use of an elevator for over 10 months.  This has caused tremendous hardship and inconvenience. It has also resulted in the aggravation of Defendants' medical conditions and disability.

b. Defendants has not had the proper use of the property since April 17, 2014 as it relates to the elevator and has suffered a breach of the covenant of quiet enjoyment due to the inconvenience, the aggravation of his medical conditions, the impact on daily living, the distress associated with the attendant hardship, etc.

c. The failure to properly communicate with tenants and giving conflicting information to the Town of Dedham, to Defendants and to the tenants, as it relates to the elevator situation and the availability of alternative accommodations, also constitutes a breach of quiet enjoyment and a breach of the covenant of good faith and fair dealing.

d. Defendants has been uprooted from his apartment and displaced for 10 months.

e. Defendants have also suffered loss of use of certain apartment features and tenancy benefits both with apt 3413 and the alternative unit apt 2216.

f. Plaintiffs have also shut-off or cause to shut-off utilities in alternative unit that Plaintiffs agreed to pay for.

g. In addition to the inconvenience experienced as it related to being displaced, Defendants also experienced other inconveniences, hardships, difficulties related to the situation.

97.   Here are examples of breach of quiet enjoyment for unit 3413:
a. Incident 1 - Broken Elevators
   i. Tenant entitled to 3 months rent (automatic statutory damages)
b. Incident 2 - Invasion of Privacy & Eavesdropping
   i. Tenant entitled to 3 months rent (automatic statutory damages)
c. Incident 3 (June 2013) - Trespass
   i. Tenant entitled to 3 months rent (automatic statutory damages)
d. Incident 4 (July 2014) - Trespass and stolen property
   i. Tenant entitled to 3 months rent (automatic statutory damages)
e. Engaging in disruptive or unreasonable conduct / Intentional intimidation or harassment of tenant
   i. Tenant entitled to 3 months rent (automatic statutory damages)
f. Water breach and flooding/failure to replace carpet/& tenant displacement
   i. Tenant entitled to 3 months rent (automatic statutory damages)
g. Emotional distress caused by landlord's miscalculation and attempt to evict tenant in 2012
   i. Tenant entitled to 3 months rent (automatic statutory damages)

98.   Here are examples of breach of quiet enjoyment for unit 2216:
a. Utilities Shutoff 1
   a. Tenant entitled to 3 months rent (automatic statutory damages)
b. Utilities Shutoff 2
   a. Tenant entitled to 3 months rent (automatic statutory damages)
c. Utilities Shutoff 3
   a. Tenant entitled to 3 months rent (automatic statutory damages)
d. Intentionally restricting or removing services
   a. Tenant entitled to 3 months rent (automatic statutory damages)
e. Bed & Couch /Refusal to Repair Toilet
   a. Tenant entitled to 3 months rent (automatic statutory damages)

99.     Here are other examples of breach of quiet enjoyment due to the Breach of Warranty of Habitability including:

    a.   Defective Dishwasher
    b.   Pervasive Cracks and Other Structural Problems in Unit 3413 and Building 3
    c.   Insects/Pests
    d.   Mold/Moldy Smell/ Noxious Odors
    e.   Heating problem in bedroom
    f.   Defective windows and doors
    g.   Defective water heater and water safety issues
    h.   And other problems outlined previously under Breach of Warranty of Habitability

100.    Plaintiffs have acted intentionally, willfully, and with reckless disregard for Defendants' rights and privileges under the covenant of quite enjoyment.

101.    As a result, Defendants is entitled to damages.

---

## *Defense*
## Equity & Justice | Tenant Should Not Lose His/Her Apartment (Avoidance of Forfeiture)

102.    Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

103. Based on principles of equity and fairness, it is unfair to evict us

---

## *Defense*
## Landlord Owes Us More Than I Owe Them

104. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

105. Based on the fact that the Landlord owes us more than we owe them, it is unfair to evict us

---

## RELIEF SOUGHT PERTAINING TO POSSESSION

---

## The Landlord Should Allow Us to Stay in Our Home
Mass. Gen. Laws c. 239, §8A (5th para.)

106. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

107. The money owed to me on the counterclaims listed below is greater than the amount of rent owed, thereby entitling me to keep possession of my home. This applies to both my nonpayment and no-fault eviction cases.

108. We request that a determination on how much we owe for purposes of cure. If we owe the landlord more rent than they owes us for our counterclaims, we claim our right to keep possession of our home by paying this amount within a reasonable time upon receiving notice of the amount due.

---

**The Landlord Should Make Repairs**
Mass. Gen. Laws c. 239, §8A (4th para.), and/or c. 111, §127I 73.

109. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

110. We request that the landlord correct the defective conditions in my home.

---

**The Landlord Should Make Reasonable Accommodations**
(Federal Fair Housing Act; Americans With Disabilities Act; Section 504 and/or Mass. Gen. Laws c. 151B)

111. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

112. We have a physical disability and we request that the landlord make reasonable accommodation(s) for the disability, including, but not limited to, stopping or postponing the eviction and/or allowing us to remain in our home.

## COUNTERCLAIMS FOR DAMAGES

*Counter Claim*
**Violation of the Security Deposit Law**
(Mass. Gen. Laws c. 239, §8A; c. 186, §15B; and/or c. 93A)

113.    Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

114.    Respondent Jefferson entered the units of Defendants and removed possessions without authority or consent, in violation of M.G.L ch. 186 #15B

115. This also includes not only the mishandling of security deposits (not providing statements, not applying interest, not placing in separate bank accounts, etc) but also includes the charging of illegal amenity fees and the charging of illegal application fees.

116. Last year, a class action lawsuit was brought against Jefferson for violation of these laws on behalf of a class of former tenants.

117. The case was settled for approximately in or near the hundreds of thousands range.

118. We are part of a class of current tenants for violation of these same laws, for which liability has already been established.

119. Tenant paid a security deposit of $300 to the landlord.

120. On information and belief, landlord violated the security deposit law by: a) Not putting the security deposit in a separate Massachusetts bank account; b) Not providing the required disclosures and information to the tenant as and when required by the security deposit law; c) Not paying or deducting from tenant's rent yearly interest as and when required by the security deposit law.

121. Landlord has also charged illegal fees for application fees and an amenity fee.

122. Tenant was charged $100 for application fees and $99 for amenity fees, which are against the law.

123. Tenant is entitled to damages due to landlord's violation of the security deposit law.

124. Landlords failed or refused to deposit security deposit belonging to Defendants in a separate, interest-bearing account in a bank located within the Commonwealth of Massachusetts under such terms as will place such deposit beyond claim of creditors of the lessor and as will provide for its transfer to a subsequent owner of said property, all in violation of M.G.L. ch. 186 #15B.

125. Respondent failed or refused to provide security deposit and interest accrued at the rate of five percent per year or such lesser amount of interest as was received from the bank where deposit was held, all in violation of M.G.L. ch. 186 #15B.

126. Plaintiffs Landlord violated security deposit law and mishandled security deposit.

127. Plaintiffs did not place the funds in a proper account, did not provide statements about the account, and did not pay interest yearly.

128. Defendants are therefore entitled to an award of damages in an amount equal to three times the amount of such security deposit plus interest at rate of five percent from date when such payment became due, together with court costs and reasonable attorneys' fees, pursuant to M.G.L. ch. 186 #15B (7).

---

### *Counter Claim*
### Violation of the Sub-Meter Law
(Mass. Gen. Laws c. 186, §22; and/or c. 93A)

---

129. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

130. The landlords required tenants to pay for water in violation of G.L. c. 186, §22.

131. Landlords have failed to or refused to provide access to Tenants' water sub-meter as required by statute.

132. Tenant is entitled to damages due to landlord's violation of G.L. c. 186, § 22.

---

### *Counter Claim*
### Unjust Enrichment

---

133. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

134. Landlords have been unjustly enriched by rent increases to Tenant and other Jefferson tenants, as well as by overpayment of water/sewage service.

135. They have sought to transfer risk from itself to tenants while planning to reimburse themselves or gain monetary compensation from insurance and/or litigation with contractors.

136. They have sought to benefit from charging full price for units that tenants are not able to use.

137. They have benefitted from incorrect water metering, rent increases, and discriminatory/disparate rents, etc.

138. By its wrongful acts and omissions, Landlords have been unjustly enriched at Tenant's expense, and conversely Tenant has been unjustly deprived.

139. Accordingly, Tenant is entitled to damages against Landlords in the amount of any profits earned by Landlords due to rent increases on apartments during the period of the breach of warranty of habitability, and in the amount of any profits earned by Landlords that are the result of overpayment caused by Landlords breach of warranty of habitability.

---

### *Counter Claim*
### Negligence (Personal Injury)

---

140. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

141. Landlords have engaged in negligence as it relates to Tenants nd have caused them personal injury.

a. Landlords have not exercised reasonable care in the use and maintenance of the property so that Tenant was not injured. Tenant was injured because of the Landlord's negligence in not providing proper bedding and seating in good condition in an alternative unit.

b. Landlords have engaged in negligence in choosing to build such a huge property on marshland without ensuring that adequate foundation was developed deep enough to prevent movement and sinking of the building.

c. Landlords have engaged in negligence in failing to ensure that the elevator structure was properly constructed.

d. Landlords at the very least engaged in negligent misrepresentation in telling Tenants that no alternative accommodation were available in April 2014, which resulted in Tenant Bisasor having to traverse 4 flights of stairs daily, and causing injury to his leg/feet pursuant to his disability.

e. Tenants reside on the top floor of building 3 and both Tenants have medical conditions that make it difficult to traverse 4 long flights of stairs multiple times a day each day.

f. Tenants both have had their medical conditions exacerbated, aggravated and worsened due to the elevator situation.

g. Tenant can hardly run or exercise now due to the pain that has developed in his feet/lower leg.

**h.** Tenants have also experienced pain and suffering as a result of back pain, neck pain, foot/leg pain due to defective bed and couch provided by Landlords in temporary unit 2216.

i. **Landlords negligence have** caused Tenant physical/bodily harm related to Tenant's foot and leg as well as back & neck injuries and pain as well as emotional distress including insomnia, anxiety, stress and headaches, due to Landlord's negligent and reckless actions.

142. Landlords owed a duty to Tenant to maintain the premises in a safe and reasonable manner without causing harm or personal injury to Tenant.

143. Landlords by or through its agents, servants, and/or employees, breached this duty of care when it negligently and carelessly caused injury to Tenants.

144. As a direct and proximate result of the negligence of Landlords, Tenant suffered personal injury and bodily harm.

145. Landlords' failure to exercise care caused Tenant to suffer in mind and body, and to suffer increased risk of bodily harm, mental anguish and emotional distress.

146. As a result, Tenant has incurred costs to treat injuries.

147. Tenant has made complaints to landlords about back & neck pain shortly after the time of the beginning of the use of the inadequate furniture.

148. There are emails showing continued complaints to landlord, emails showing refusal of Landlord to change the bed and furniture, and emails showing denial of reasonable accommodation requests by landlord.

149. Tenant has also made reports to doctor/healthcare providers about back & neck pain shortly after the time of the beginning of the use of the inadequate furniture.

150. Tenants had no previous complaints about back & neck pain to their doctors nowhere in their medical history.

151. Besides tenants' testimony of the onset of back & neck pain, there is also evidence of injury based on treatment by a physical therapist as well as doctors evaluation and even doctors' letters requesting reasonable accommodations for and on behalf of tenants.

152. Tenants also have tens of thousands of medical bills which are also evidence of injury.

153. Tenants have also had to take medication for treatment of injury and for pain.

154. Tenants have also suffered further injury in terms of loss of consortium, pain in buttocks and legs, feet/foot pain as well as other harm from body pain, soreness, fatigue, insomnia and aggravated or worsened conditions including asthma.

155. Tenants have also incurred additional expenses including out of pocket expenses for gas, parking, medication, bedding accessories and lost time from work.

156. Tenants are seeking compensation for pain & suffering, compensation for out of pocket costs, compensation for future treatment, and compensation for future pain & suffering.

---

## Counter Claim
### Emotional Damages (Intentional Emotional Distress)

---

157. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

158. Landlords caused or created emotional distress for Tenants.

159. Landlords negligently and intentionally inflicted emotional distress on Tenants when as a direct and proximate result of the carelessness and negligence of Landlord, Tenants was caused to suffer severe emotional distress, as the result of which a reasonable person in his position would have suffered similar emotional distress under the circumstances.

160. Landlords knew that discriminating/retaliating/threatening/harassing Tenants would cause emotional distress.

161. Tenants have sustained damages as a result of Landlords intentional infliction of emotional distress on them.

---

*Counter Claim*
**Violations of Fair Debt Collection Practices Act and Massachusetts Consumer Debt Collection Act**

---

162.     Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

163.     Defendants are "consumers" as the term is defined by the Fair Debt Collection Practices Act (FDCPA) and by the Massachusetts Consumer Debt Collection Act (MCDPA).

164.     The foregoing acts and omissions of the Plaintiffs constitute numerous and multiple violations of the FDCPA/MCDPA, including every one of the above-cited provisions.

165. On October 16, 2014, Ms. Ashton sent me and my wife communications in an attempt to collect a debt on behalf of Jefferson. She failed to advise to provide the required notice under Federal law that states she must disclose certain rights to me pursuant to FDCPA. By failing to do so, that is automatically is entitles me to statutory damages per incident per person plus attorney fees.

166. There are at least two or three other instances where   Ms. Ashton sent me formal communications in an attempt to collect a debt but failed to provide the required FDCPA disclosures.

167. On December 23, 2014. She finally includes the FDCPA notice in her communications to me and my wife but she still failed to allow the required 30 days for me to dispute the debt before initiating legal action. She initiated eviction on January 12, 2015 even though she was required to wait until at least January 23, 2015 before she initiated further action. This entitles me again to statutory damages per incident per person plus attorney fees.

168. When I finally provided a request for debt validation on January 21, 2015, she failed to provide all of the documentation requested that would prove the validity of the debt and the exact amounts of the debt. This entitles me again to statutory damages per incident per person plus attorney fees.

169. When I brought these issues to Ms. Ashton's attention asking her to comply with the FDCPA, she rebuffed me telling me a lie that these things don't apply and that I misunderstood the law. Later she reversed course and tried to cover her tracks after I continued to put pressure on her to comply with the FDCPA, thereby implicitly showing that I in fact read the law correctly. The FDCPA prohibits unfair, deceptive acts and false statements and misrepresentations by a debt collector when dealing with consumers. By making these false misrepresentations, Ms. Ashton sough to mislead me regarding my

rights and thus violated the FDCPA. This entitles me again to statutory damages per incident per person plus attorney fees.

170. I have asked Ms. Ashton to not communicate with me on several occasions in the past.

    a.  Under the FDCPA, I have a right to request that attorney debt collectors do not communicate with me.

    b.  Since I was not represented by counsel, I felt that my communicating with a debt collector attorney would put me at a disadvantage.

    c.  This is also something I found to be of concern in the Massachusetts rules of professional conduct for lawyers.

    d.  So I insisted that I communicate with Jefferson management only but Ms. Ashton insisted that she communicate with me and eventually forced me to have to communicate with her.

    e.  This is a violation of the FDCPA and it entitles me again to statutory damages per incident per person plus attorney fees.

171. Ms. Ashton has refused to provide information regarding the service details by her process server Mathew Lupica for service claimed to have been effected on January 12, 2015, even though she promised she would do so.

    a.  Instead she has reneged on her promise, thereby misrepresenting herself and misleading me regarding the same.

    b.  Undoubtedly she uncovered unfavorable information regarding the fact that I had challenged the service return as a false return and this goes to the heart of perjury or suborning perjury by Jefferson and this is likely why she misled me and made false promises to me.

    c.  Either way, this is a violation of the FDCPA and it entitles me again to statutory damages per incident per person plus attorney fees.

172. Ms. Ashton knowingly gave me selective and edited documentation regarding the bills that form the basis for proving debt validity.

    a.  When I ask for the excluded bills, she remains silent on the matter. This shows willful deception.

    b.  This is a violation of the FDCPA and it entitles me again to statutory damages per incident per person plus attorney fees.

173. We will be seeking to hold Deutsche Bank accountable for the actions of Donna Ashton and the FDCPA laws provide that we can collect damage awards against any purported debt that they seek to collect.

    a.  By having Donna Ashton as the debt collector, she has already created at least $16,000 or more worth of statutory damages automatically collectible by us  against the landlord as original creditor (without even getting into the statutory or other damages based on the numerous other claims that we have against Jefferson and the bank directly).

174. Landlord hired a debt collector to serve a 14-day notice to quit on Tenants and advised Tenants of its FDCPA rights including having 30 days with which to dispute the debt.

    a.  The Landlord is required to give Tenants 30days to dispute the debt under FDCPA.

    b.  By filing this eviction action before the 30 days expired, the Landlord did not give Tenants the time provided by law.

    c.   Therefore, the Landlord started this case before the required time by law expired.

    d.   The Notice to Quit was also thus unclear and/or misleading because it gave two dates with which Tenants should comply; one was 14days and the other was 30 days and thus obscuring Tenants' rights.

    e.   Landlord has failed to comply with the 30 day requirement of the FDCPA to allow for dispute of debt and has not provided proper verification of the debt though requested several times by Tenants and as required by the FDCPA.

175. Landlords have violated the FDCPA/MCDPA by engaging in false or misleading representations in connection with the collection of debts as follows:
    a.   The FDCPA/MCDPA prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt.
    b.   In numerous instances, in connection with the collection of debts, Landlords, directly or indirectly, have used false, deceptive, or misleading representations or means.
    c.   Landlords' representations constitute false, deceptive, or misleading representations or means, in violation of the FDCPA/MCDPA.

176. Landlords have violated the FDCPA/MCDPA by engaging unlawful third-party communications in connection with the collection of debts as follows:
    a.   The FDCPA/MCDPA governs communications in connection with a debt generally. It prohibits communications about a debt with any person other than the consumer, except with the permission of the consumer.
    b.   Landlords, directly or indirectly, have communicated about a debt with persons other than the consumer, without the permission of the consumer.
    c.   These acts constitute violations of the FDCPA/MCDPA.

177. Landlords have violated the FDCPA/MCDPA by engaging in unlawful failure to cease communications in connection with the collection of debts as follows:
    a.   The FDCPA/MCDPA specifically prohibits communication with a consumer with respect to a debt if the consumer has notified the debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer except to advise the consumer that the debt collector's further efforts are being terminated, to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor, or to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.
    b.   Landlords, directly or indirectly, have communicated with consumers with respect to a debt after the consumers have notified Landlords in writing that the consumers wish Landlords to cease further communication.
    c.   Such communications are not made to advise the consumers that Landlords' further efforts were being terminated, to notify the consumers that Landlords or creditors may invoke specified remedies which are ordinarily invoked, or to notify the consumers that Landlords or creditors intended to invoke a specified remedy.

178. Landlords have violated the FDCPA/MCDPA by engaging in annoying, abusive, or harassing communications and actions in connection with the collection of debts as follows:
    a.   The FDCPA/MCDPA prohibits debt collectors from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.
    b.   Landlords, directly or indirectly, have engaged in conduct the natural consequence of which is to harass, oppress, or abuse persons.

    c.   The Landlords' conduct violated the FDCPA/MCDPA in that Landlords engaged in behavior the natural consequence of which was to harass, oppress, or abuse the Tenant in connection with the collection of a debt.

179. Landlord did not comply with the request for validation of debt:

    a.   Landlord refused to address the issue of the rent waiver at least for the months that the elevators were down which are 6 months or more.
        i.   The unit 3413 was uninhabitable at least for the times that the elevator was down which is why it became absolutely necessary for tenants to be displaced.
        ii.   Landlord then agreed to have tenants sign a lease for $0 rent for unit 2216, thereby waiving rent.
        iii.   If Landlord wanted to charge rent, they should have charged us rent for unit 2216, but they did not.
        iv.   There is no way they could expect to charge rent for a unit that tenants were not living in and that was uninhabitable.
        v.   Moreover, the unit was/is uninhabitable because of tenant's disabilities for which reasonable accommodation is needed, and for which Landlord has failed to provide.
        vi.   All of this creates the basis for a rent waiver and/or right to withhold rent.
        vii.   Additionally, Landlord previously agreed specifically to waive rent both orally and in writing.
        viii.   This was the agreement (and Landlord cannot now change its mind and renege on that agreement).

    b.   Landlord has failed to verify or correct computations in the documents it provided that are contradictory as follows:
        i.   The bills for months August through December 2014 are missing.
        ii.   That is at least 5 months of bills that are missing.
        iii.   This is highly suspicious and tenants would like to see all of the bills that were previously generated and sent to tenants including for months August through December 2014.
        iv.   Also, there are discrepancies with Landlord's numbers.
        v.   There are also errors with a very high charge for water during the months of May, June and July 2014 when tenants were not living in unit 3413.

    c.   Tenant has requested but Landlord has refused to show the original water commission bills for water usage for unit (from April 2014 until present), and not only the bills prepared by Greystar.

180.   Plaintiffs continue to violate the FDCPA/MCDPA in other ways, in connection with the collection of debts such as:

    a.   Failing to provide validation of debt
    b.   Collecting an amount other than rent
    c.   Other prohibited communications
    d.   Commencing lawsuit prior to the time allowed for validation of debt
    e.   Conspiring to submit a false return in court
    f.   Including prohibited language on envelope sent to Tenants
    g.   Misrepresenting that Debt Collector was complying with FDCPA when it was not
    h.   Telling third parties about the debt (i.e. rent being owed and eviction situation)
    i.   Failing to provide mini-miranda warning in October 15 letter From Donna Ashton
    j.   Bringing lawsuit without debt validation
    k.   Harassing tenants at tenant's door, provoking physical confrontation and abusive conduct

181.    The Defendants has suffered and continues to suffer actual damages as a result of the Plaintiffs' unlawful conduct.

182.    As a direct consequence of the Plaintiffs' acts, practices and conduct, the Defendants suffered and continue to suffer from humiliation, anxiety, emotional distress, fear, frustration and embarrassment.

---

### *Counter Claim*
### Violation of the Consumer Protection Law
### (Mass. Gen. Laws c. 239, §8A, and/or c. 93A)

---

183.    Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

184.    Plaintiffs are engaged in trade and commerce as defined by Massachusetts General Laws, Chapter 93A.

185.    The foregoing actions and inactions of Plaintiffs constitutes unfair and deceptive acts and practices as defined by, and in violation of Massachusetts General Laws, Chapter 93A.

186. Therefore the landlord is subject to G.L. c. 93A, and each of the acts stated in this brief was unfair and/or deceptive.

187. The landlord charged us late fees before our rent was thirty days late.

188. The landlord charged a rent amount that we never agreed to pay.

189. There are unlawful terms in our lease.

190. Therefore, under G.L. c. 93A, we are entitled to statutory damages for each violation, or actual damages (doubled or trebled because the landlord's conduct was willful and knowing), whichever is greater.

191. The landlord is subject to G.L. c. 93A as landlord is engaged in trade and commerce in the Commonwealth of Massachusetts.

192. Landlord's actions and omissions as described above constitute unfair and deceptive acts or practices made unlawful under c. 93A § 2. Pursuant to G.L. c. 93A, tenant is entitled to statutory damages or actual damages for each violation, doubled or trebled because the landlord's conduct was willful and knowing.

193. Landlords, in breaching Tenants' right to quiet enjoyment, attempting to wrongfully evict Tenants from their unit, and discriminating against Tenants in access to housing, engaged in unfair and deceptive trade practices.

194. Landlords' trespass to real property and trespass to personal property are unfair and deceptive trade practices.

195. Landlords Landlord has engaged in actions that have resulted in the unnecessary delay of the repair of the elevator in order to save money:

    a)      On information and belief, Landlords Landlord refused to follow the recommendations of the Massachusetts Department of Public Safety (MDPS) who directed the Landlords Landlord to replace the elevator rather than simply repair it.  Instead of complying with the directives from the State, Landlord has insisted on utilizing appeal processes to try to avoid implementing the MDPS recommendations. There is a news report on CBS that states that MDPS is concerned about a catastrophic failure of the elevators and that their recommendation to replace the elevator is borne out of that concern.

    b)      Landlord has prioritized saving money at the expense of considering what is best for tenants.  Their refusal to follow the State's directives is due to a desire to save money at the expense of the utmost safety of the tenants. Their attempt to make legal challenges to the state's recommendation has only caused more delays in fixing the elevators. Therefore the Landlord is at fault for the continued delays in the restoration of the elevator service. If the Landlord had simply complied with the state's recommendation, the elevator would have been restored much earlier than 10 months that it took to make all final repairs to the elevators.

    c)      On June 10, 2014, the local CBS news channel ran a story, including video footage, that featured Jefferson at Dedham Station and that quoted State inspectors as saying:  "they are concerned about a "catastrophic failure" of an elevator at a Dedham complex".

196. Landlords, at least partially, are at fault or responsible For The Broken Elevator:

    a.    On information and belief, Jefferson apartment management/ownership is responsible for the problem with the elevator.

    b.    Even if management provides proof in writing (either by the contractors or the engineers or by an insurance company) stating that the problem is in no way was caused by something that management/ownership did or did not do at any time either in the original construction or in subsequent maintenance/upkeep, then Jefferson apartment/management is at least to some extent still responsible for the cause of the broken elevators.

    c.    Jefferson had knowledge of the expansive and pervasive nature of the problem with the elevators including the structural and foundational problems with the building and the shaft, and as such management was at least partly responsible for decisions that led to the problem with the elevators, including decisions by management to cut corners or save money to detriment of the building safety.

    d.    Even if some of this was done by the previous ownership (JPI), their liability for such actions would be transferred to Landlords and it would still be the responsibility of current management/ownership to assume such liability.

    e.    Notwithstanding the fact that Landlords' insurance will likely reimburse them for their own contribution to any negligence or other intentional acts, Landlords still wrongly attempted to transfer the risk or liability costs to tenants by forcing tenants to go uncompensated for the non-working elevators.

197. Landlords have engaged in intentional misrepresentation including but not limited to the following:

    a.    Landlords induced Tenant to enter into an agreement whereby Landlords promised that Tenant would not suffer regular rent increases ad that if there was a rent increase, it would be

on average about $50 but never more than $100 in rent increases. However, since then, Landlords have increased Tenant's rent by several hundred dollars on several occasions.

b.   Landlords also induced Tenant to take a certain alternative unit while denying that other apartments were available. Landlords also lied to Tenant that no accommodations were available.

c.   Landlords also lied to the Town of Dedham in stating that they communicated availability of accommodations to the tenants, when they did not.

d.   Landlords also lied about the reason that the operations manager, Chris Esmond, denied reasonable accommodations to Tenant and his wife.

198. Landlords have engaged in active concealment including but not limited to the following:

a.   Landlords had a duty to disclose the availability of alternative accommodations but yet took active steps to conceal the fact that such alternative accommodations were available. They first took passive steps to conceal the availability of these alternative accommodations by not telling tenants by email or letter that such accommodations were available, even-though they on the other hand had told town officials that they had offered such accommodations to all tenants. They actively concealed this same information by telling Tenant that nothing was available even-though Tenant called management to specifically ask.

b.   Landlords had a duty to disclose all of the apartment units that were available in the complex. Landlords took steps to actively conceal the availability of certain apartment locations for either temporary or permanent move. There were several other apartments, including more desirable units, that were vacant but that were never disclosed to Tenant.

199. Landlords have engaged in misrepresentation and deception including but not limited to the following:

a.   Landlords have engaged in other unfair and deceptive practices that have caused Tenant harm including making misrepresentations about the availability of accommodations, discrimination and retaliation, telling the city one thing while telling Tenant and other tenants another thing, changing and withdrawing offers and terms related to offer for alternative accommodations, not providing full and complete information requested in the process of determining which unit to move to, and being evasive about the terms of the alternative accommodations, etc.

b.   Landlords make offers and then rescind offers to drag out time. If the details of the offer are unclear, and Tenant want to take time to iron out details, Landlords try to hold it against Tenant that Tenant didn't take the offer immediately

c.   Landlords have engaged in lies, deception and unethical tactics including psychological manipulation. They try to create skewed email records by twisting what was discussed in person. They lied to the Town officials; They lied to the Tenant; They lied to other tenants.

d.   They refused to assist with Tenant's move; first they offered hotel option then withdrew the hotel offer, then put it back on the table in limited manner. First they offered utilities then they withdrew them, then they offered it back, then they downgraded them to the minimum. They put up roadblocks to Tenant taking the offer such as telling Tenant a doctor's note was required, then leading Tenant to believe it wasn't really required, then telling Tenant again that it is required. They keep changing their positions so that it is hard to know what to rely on. They resist putting things in writing and prefer to discuss verbally off the record so that they can change their stories and later deny what they told Tenant.

e. Landlords have engaged in deception and deceptive acts. To the extent that such acts may be otherwise lawful, these acts are nevertheless unfair or oppressive acts. Landlords have engaged in lies and misrepresentation including: lying by omission, deception by fine print, false advertising, dishonest communication/activity and non-transparency with the tenants. Landlords have made misrepresentations to the Town of Dedham, to the Tenant and to other tenants and have engaged in "bait and switch" tactics regarding offer for alternative housing and pull back on offer in retaliation, etc.

f. Landlords engaged in dragging things out in order to avoid paying costs to replace elevator, creating undue hardship, inconvenience and damages to Tenant.

g. Landlords engaged in delaying tactics on a number of critical issues relating to Tenant in order to wait until elevators were finally fixed after ten months of waiting by Tenant, creating undue hardship, inconvenience and damages to Tenant.

h. Landlords have engaged in violations of the State Building Code and State Sanitary Code.

i. Landlords have refused to show Tenant his tenant file.

j. Landlords' failed or refused to assist Tenant with moving.

k. Landlords continually engaged in changing offers, rescinding offer to cover light and water; rescinding offer to stay at hotel for the long haul, making implied threats and forcing us to move; signaling that we are unwelcome at the office.

l. Landlords have engaged in hostile, negative, uncooperative, antagonistic and unhelpful attitude towards Tenant in retaliation.

m. Landlords have refused, in bad faith, to offer or provide rent abatement to Tenant, though initially leading Tenant to believe that they would.

n. Landlords have attempted to retaliate by threatening or attempting to evict Tenant and by raising his rent by upwards of $300, after Tenant made complaints to the Town of Dedham, etc, about bad conditions.

o. Landlords refused to let Tenant know units available and Landlords refused to show vacant available units to Tenant.  Landlords denied alternative housing to Tenant.  Landlords lied about the reason that operations mgr denied accommodations to Tenant. Landlords refused to make reasonable accommodation for disabilities. Landlords refused to do air testing for mold as a reasonable accommodation; and refused to provide hypo-allergenic filters for AC unit.

p. Landlords have failed or refused to address suspicious water metering problems and have refused to show water sub-meter to Tenant though Tenant has requested this many times and though the Town of Dedham has instructed them to do so.

q. Landlords have trespassed upon Tenant's apartment, entering unit without permission. Landlords have insisted on not tagging Tenant' unit correctly in the system as "appointment only". Landlords have also made misrepresentations about their computer key system to the police as well as to Tenant.

r. Landlords refused to make timely, or adequate repairs including of dishwasher and cracks in ceilings/walls.

s.   Landlords have improper handled Tenant's security deposit and have done the same for other tenants.

t.   Landlords have engaged in unequal treatment of tenants in violation of the equal protection of laws.

u.   Landlords have lied to tenants telling them they are not welcome to attend public meetings.

v.   Landlords have required that Tenant signs invalid and illegal clauses in his lease

w.   Landlords have refused to provide answers in writing or to document representations and offers made by them to Tenant.

x.   Landlords knowingly caused Tenant emotional distress by falsely attempting to evict Tenant or otherwise retaliating against Tenant.

y.   Landlords failed to inform all residents of the opportunity available for alternative housing.

z.   Landlords gave in to adamant request of other tenants to not go to hotel; but refused Tenant's adamant request to go to hotel.

aa.  Landlords have failed to investigate and root out unfair practices, discrimination, retaliation, which if done, would ensure ethical and honest management.

bb.  Landlords have engaged in "steering" Tenant away from the best apartments.

cc.  Unjust enrichment to themselves through insurance, and forcing us to bear the brunt of the cost.

dd.  Landlords have engaged in unfair debt collection practices.

ee.  Tenant has suffered harm, including emotional distress, and loss of time for work and out-of-pocket and other costs such as attorney's fees.  Tenant is also entitled to money damages including statutory damages or actual damages for each violation, with amounts doubled or trebled, since Landlords knew or should have known her acts were unfair or deceptive.

200.Other deceptive acts by Landlord:

a)   **Lying or causing other to lie to the State board of elevators.** I have stated previously that both Simpson and Jefferson misled the board of elevators in telling them under oath that there were no cracks anywhere else in the buildings.

b)   L**ying about the reason for not fixing the cracks on November 24, 2014.** Prior to that there were several other dates for which they had access to our apartment to fix the cracks but failed to fix the cracks. This is undeniable.

c)   **Lying about replacing the bed**. I have emails that show that we were waiting on Jefferson to replace the bed including frame and headboard. After much pushing, they dropped off a mattress but the mattress was no better than the prior one but more importantly, the shaky unstable dysfunction bed frame and headboard were never replaced. When we insisted and pushed, Laura Donahue came to my apartment to inspect along with a maintenance person and they both determined that the bed needed to be replaced because it was o shaky, unstable and uneven. The email records show that Laura promised me that she would ask the local vendor

to replace the entire bed. But this was never done. There is no way around this. The email record is 100% clear. Even to this day, when I ask again and about the bed and couch to be replaced, Jefferson either outright ignores me, or lies and says the matter was already resolved or just simply flat-out refuses to do it, denying me my right to reasonable accommodations even-though I have shown medical documentation that this is a medical necessity.

d)   **Shutting off utilities in my apartment**. Jefferson either caused or allowed our utilities to be shutoff twice in our alternative unit due to non-payment.  This is undeniable. For this to occur twice is inexcusable and shows an attempt to make us feel uncomfortable in our home and it shows retaliation as these events occurred just after we asserted certain rights.

e)   **Lying to a police officer as it relates to a breach to my apartment**. I have direct proof that Sara McNeely lied to the police when she told him that no one entered my apartment and referenced a secure key log system.  Yet when I asked to see the key logs that same day, she told me that she did not have access to the key log reports as yet because they take time to generate and therefore she had not yet seen the key log reports.

f)   **Lying to town officials**. I have direct proof that Jefferson management lied to town officials in or around April 2014 in telling them that all tenants were made aware that there were alternative housing accommodations available at a local hotel to any tenant that needed it. Jefferson emails and hand-delivered notices about the elevators in April 2014 did not in any way communicate that housing accommodations were available to tenants. The record here is very clear despite attempts to stretch the imagination to make words appear that do not exist in these communications.

g)   **Jefferson has reneged on promises to waive or abate rent**. I have emails that show this intent. This is undeniable.  However, Jefferson has reneged on these promises in retaliation for making reports to government officials.

h)   Failure to reply to 93A within statutory deadline and before structural report was even ready

i)   Refusal to offer a reasonable settlement

j)   Lying about sending the 93A response on time by mail and by email in order to deceived us about Plaintiff's meeting statutory deadline.

k)  There are about 48 incidents of Plaintiffs charging late fee before 30 days required by the lease

201. Landlords have placed illegal clauses into the lease contract. There are waivers in Tenant contract/lease that violate Massachusetts law, etc., including but not limited to the following:

a.   Paragraph 18 states it is prohibited to engage in:  "**injuring our reputation by making bad faith allegations against us to others or violating any Federal, state, or local law, or ordinance**."  Landlords are attempting to intimidate tenants into waiving their right to make complaints to the government about the Landlords. This clause therefore violates the intent of public policy.

b.   Paragraph 30 states that Tenant will be in default if: "**(7) you or any guest or occupant engages in any of the prohibited conduct described in Paragraph 18; or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government**."  Landlords are attempting to intimidate tenants into waiving their right to make complaints to the government about the Landlords. This clause therefore violates the intent of public policy.

c.  Paragraph 31 states: "**In the event that you commence any litigation against us, and you
fail to obtain judgment in your favor, you agree to reimburse us for any and all attorney
fees and costs that we incur in relation to the defense of such action.**"  Landlords are
attempting to intimidate tenants into waiving their right to commence litigation in order to
enforce legal rights. This clause therefore violates the intent of public policy.

d.  Landlords have also used another provision that: *"WAIVER OF JURY TRIAL. To
minimize legal expenses and, to the extent allowed by law, you and we agree that a trial
of any lawsuit based on statute common law, and/or related to this Lease Contract shall
be to a judge and not a jury."* Landlords are attempting to intimidate tenants into waiving
their right to commence litigation in order to enforce legal rights. This clause therefore violates
the intent of public policy.

e.  Paragraph 23 states:  *"CONDITION OF THE PREMISES AND ALTERATIONS.
You accept the apartment, fixtures, and furniture as is, except for conditions materially
affecting the health or safety of ordinary persons."* Landlords are attempting to trick tenants
into waiving their right to make complaints about defective conditions. This clause therefore
violates the intent of public policy. This construction is a clear and calculated effort to mislead
tenants and it suggests to tenants that their signatures on the lease constitute a waiver of their
right to habitable housing and represents "an unabashed attempt to annul or render less
meaningful" rights guaranteed by the State sanitary code and the warranty of habitability.

f.  The SPECIAL PROVISIONS section states: "**If you become a month to month resident
you agree to pay the prevailing market rent, as specified by Jefferson at Dedham
Station, for your unit plus the then prevailing month to month premium for each month
that you remain as a month to month resident.**"  Landlords are attempting to collect an
illegal fee by charging an open-ended blank check month to month premium. This clause
therefore violates the intent of public policy.

g.  The provisions in the lease possess "a tendency to deceive", based on the effect which it might
reasonably be expected to have upon the general public.

202. Landlord Jefferson conduct alleged herein in making false and misleading representations to Tenant
constitutes unfair and deceptive practices within the meaning of Mass. Gen. L. ch. 93A, ##2 and 9.
Landlord's actions, statements and omissions alleged herein were committed willfully and knowingly.

203.    Plaintiffs failed to provide an executed copy of the lease/rental agreement within 30 days of
Defendants' signing of it (940 CMR 3.17 (3))

204.    Plaintiffs have failed to include into the lease the following:

a.  The names, addresses, and telephone numbers of the owners and other persons who are
responsible for the care, maintenance, and repair of the property;

b.  The name, address, and telephone number of the person authorized to receive notices of
violations of law and to accept notice of a lawsuit on behalf of the owner.

205. As a result of the unfair and deceptive acts or practices alleged herein, Tenant sustained injury.

206. Tenants have sent more than one written communications to Landlords describing, in one form or
other, the unfair acts or practices described above and the injuries suffered as well as demanding relief
or that action is taken to remedy the situation by Landlords.

207. Landlords have refused to make reasonable offers of relief to Tenants

208. This refusal to grant relief was done in bad faith with knowledge or reason to know that the acts of Landlords violated Massachusetts Laws.

209.   In consequence of Plaintiffs unfair and deceptive acts, Defendants has suffered and will continue to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

210.   Plaintiffs have acted intentionally, willfully, and with reckless disregard for Defendants' rights and for the established public policy in the state, and are immoral, unethical, and unscrupulous, and as a result, Defendants have suffered damages.

211. Tenants are entitled to an award of treble damages incurred in connection with this action pursuant to Massachusetts General Laws 93A.

---

## *Counterclaim*
### Abuse of Process under Color of Law by Constable as Agent for Greystar / Civil Conspiracy

---

212. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

213. Landlord engaged in a conspiracy, along with its process server Mr. Lupica, to submit a false return of service to the court.

214. Landlord knew that did not its process server deliver any summons to tenants' door on January 12, 2015.

---

## *Counterclaim*
### Breach of Contract

---

215. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

216.   Plaintiffs entered into a lease with and have made representations and promises to Defendants, which created a contract with Defendants.

217.   Defendants relied on the terms and conditions of the lease, and these representations and promises of Plaintiffs in seeking to become associated with Plaintiffs and later in seeking to avail themselves of all of the benefits, access, resources and protections available to them as promised by Plaintiffs.

218.   Plaintiffs breached this contract by refusing to adhere to the lease terms, by treating Defendants in an unfair, deceptive and disparate/discriminatory manner and by retaliating against Defendants when they raised concerns about such treatment.

219.   Defendants signed a lease that guaranteed the use of the apartment unit 3413 on the fourth floor of Building 3 of the Jefferson at Dedham Station apartment complex.

220.    Defendants have not had the use of this apartment for several months as he has been displaced to either a hotel or to a smaller alternative unit due to a broken elevator.

221.    Plaintiffs are contractually obligated to provide working dishwasher in Defendants' apartment. Dishwasher has been inoperable since 2009. Dishwasher is still not operable and has been inoperable for almost 7 years. Defendants have advised Plaintiffs of the problem both in writing and orally but Plaintiffs have failed to make timely and adequate repairs. Plaintiffs' failure to provide to make timely and adequate repairs constitutes a breach of contract.

222.    Amenities in the Jefferson at Dedham Station apartment complex include a business center with conference room. Plaintiffs have marketed and advertised this amenity in its effort to attract tenants. Defendants use this conference room and business center frequently and this was one of the reasons Defendants selected the apartment complex. The Conference room in the business center was turned into a "lounge" and the conference table and conference furniture was removed from the room and replaced with easy chairs and coffee table. Plaintiffs continue to market the conference room facilities on its website, and other advertising for the facility. Plaintiffs' failure to provide a conference room in its business center constitutes a breach of contract.

223.    As a result of Plaintiffs' breach, Defendants has suffered the loss of use of certain apartment features and tenancy benefits related to apartment unit 3413, including but not limited to the following:

**Apt 3413 (Original Unit) on Fourth/Top Floor:**
1.  Inoperable dishwasher
2.  Multiple cracks in walls and ceilings
3.  Bugs and Insects coming through cracks in walls and ceiling
4.  Doors jamming or not opening/closing properly
5.  Windows jamming or not opening/closing properly
6.  Displaced tiling in the kitchen
7.  Un-cleaned carpet for over 7 years while other tenants have received yearly carpet cleaning
8.  Untested/moldy air quality
9.  Shower rods and nozzle broken or not functional
10. Screens worn and in bad condition
11. Broken latch on Front Door
12. Water dripping on common hallway carpet in front of unit Front Door resulting in damp/moldy carpet in front of apt door.
13. AC-heat in second bedroom not working properly; room is always colder during winter
14. Front door sealant in need of replacing
15. Noxious odors
16. Continual smell of marijuana protruding into Defendants' unit from other nearby units
17. Garbage disposal not working
18. And many other issues/conditions that are outlined elsewhere

Defendants have had to live with many of these conditions for several years.

224.    In order to effectuate the displacement, Plaintiffs had Defendants sign a lease for the smaller alternative unit, located at 2000 Presidents Way Unit # 2216, Dedham, MA 02026. This lease was to cover periods for which bad conditions existed relative to apartment unit 3413 including broken elevators.

225.    However, Plaintiffs have also provided bad conditions in the alternative unit 2216. Defendants were provided with subpar conditions in the alternative unit 2216 including, for example, a non-functional bed that caused bodily injury/pain and sleepless nights and a couch that was sunken and caused further bodily injury and pain. Plaintiffs have also shut-off or cause to shut-off utilities in alternative unit that Plaintiffs agreed to pay for. Plaintiffs have also not been responsive to its 48 hr guarantee to do repairs in alternative unit.

226.     Defendants suffered loss of access to home-based office in apt 3413 for which no accommodations have been made though requested, including assistance with moving. Defendants were rebuffed and have suffered losses as a result.

227.     Defendants have suffered the loss of space & size of apartment. Defendants were displaced to a smaller one bedroom/one bath unit versus the larger two bedroom/two bath unit (with higher end features/floor plan) that Defendants were displaced from. Plaintiffs first refused to provide rent adjustment; then later refused to follow through on promises of a rent adjustment.

228.     Plaintiffs have failed to provide reasonable accommodation for the medical situations pertaining to Defendants in failing to provide assistance with moving to the alternative unit.

229.     The lease agreements between Defendants and Plaintiffs require Plaintiffs to, among other things, do the following:

   a.   Plaintiffs promised in paragraph 3 of the lease that: *"Unless the landlord serves a notice of non-renewal at least **60 days** prior to the expiration of the initial term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of the initial term, this Lease Contract will automatically renew on (check one):"* Plaintiffs failed to serve Defendants with a notice of non-renewal at 60 days prior to the expiration of the term, even-though they had the intention to not renew Defendants' lease term. Plaintiffs also have a pattern and practice of not giving the requisite 60-day notice in order to create unfair leverage to force high rent increases.

   b.   Plaintiffs agreed in paragraph 6 of the lease that *"you must not withhold or offset rent unless authorized by statute."* Yet when Defendants withheld rent as authorized by statute, Plaintiffs refused to follow the lease by threatening eviction among other things.

   c.   Plaintiffs promised in paragraph 4 of the least that: *"If we request the last month's rent from you along with the security deposit, we will comply with the requirements of G.L. c. 186 § 15B (2)."* Plaintiffs did not comply with this provision nor the requirements of G.L. c. 186 § 15B and therefore did breach the lease.

   d.   Plaintiffs promised in paragraph 7 of the lease that: *"If water/sewer utilities are sub-metered for the apartment, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance."* Plaintiffs have failed to follow state agency rules or city ordinances related to water sub-metering.

   e.   Plaintiffs promised in paragraph 8 of the lease that: *"SUBJECT TO APPLICABLE LAW, THE LANDLORD WILL PROVIDE INSURANCE FOR UP TO $750 IN BENEFITS TO COVER THE ACTUAL COSTS OF RELOCATION OF THE TENANT IF DISPLACED…"* When elevators became inoperable and Defendants became displaced, Plaintiffs refused to cover any cost of relocation.

   f.   Plaintiffs promise in paragraph 29 of the lease that: *"RESPONSIBILITIES **OF OWNER.** Subject to Chapter 410.000 of the Sanitary Code, we'll act with customary diligence to: (1) keep common areas reasonably clean, subject to paragraph 23; (2) maintain building fixtures, furniture, hot water, heating and A/C equipment; (3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and (4) make all legally required repairs.."* Plaintiffs did not comply with this provision and therefore did breach the lease.

   g.   Plaintiffs breached the lease when it required that Defendants no longer could enjoy a functioning elevator to reach the top floor of the apartment complex. It changed the terms of

the leasing arrangement by effectively requiring that Defendants move to another lesser apartment that was smaller in size with less amenities and non-functioning furnishings.

h.   Plaintiffs agreed that Defendants could conduct lawful business at home but then displaced Defendants from his home office, causing damages.

i.   Plaintiffs promised to provide insurance for missing item missing from Defendants' home while displaced due to elevators but refused to follow through on that promise.

j.   Plaintiffs promised to meet with Defendants for resolution to address outstanding issues but refused to follow through for a variety of reasons.

k.   When Defendants have tried to get certain promises or representations in writing, Plaintiffs have in the past refused to do so, though mandated by the lease (i.e. the lease states that things must be in writing to be valid and that oral representations are not).  Plaintiffs typically endeavor to keep such things to verbal conversations in order to allow them to change their minds at a later point in time and deny ever making certain promises. This has caused much harm to Defendants as a result of Plaintiffs actions.

230. Defendants are entitled to damages for the reduced value of their apartment, calculated as the difference between: a) the full market rental value of the apartment in the leased condition, and (b) the reduced value of the apartment due to inoperable dishwasher since around 2009, long-standing cracks holes and separations in the apartment (since 2008), and the insects that gain entry through them, AC-heat in second bedroom not working properly; front door sealant in need of replacing; persistent noxious odors and c) the reduced value of the premises without a usable conference room in the business center as well as non-working elevator and non-working equipment/electronics in fitness center for several months at a time, and the widespread cracking in the common areas in the building and its exterior, etc.

231.   Defendants have been injured by Plaintiffs' breach of the lease agreement.

232.   Plaintiff has been injured by Defendants' breach of the lease agreement in an amount to be proven at trial.

233.   As a result of those actions, Defendants have suffered and will continue to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

234.   Defendants are also entitled to total or partial abatement of past and future rent, declaratory relief, injunctive relief, and attorney's fees.

---

*Counterclaim*
**Trespass To Real Property**

---

235.   Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

236.   Upon becoming tenants, Defendants had the exclusive right of possession of his unit.

237.   Subsequent to Defendants becoming tenants, Plaintiffs entered Defendants' unit without the Defendants' authorization.

238.     After entering Defendants' unit without authorization, Plaintiffs attempted to cosmetically cover- up cracks in the ceiling and walls and then denied doing so.

239.     After Defendants discovered that Plaintiffs entered Defendants' unit without authorization, and brought it to the attention of the Plaintiffs, Plaintiffs issued a ban that prohibited Defendants from speaking with Maintenance staff persons about the matter.

240.     Defendants has warned Plaintiffs several times about not entering his apartment without permission or without his being present, but Plaintiffs refuses to comply.

241.     Plaintiffs have even entered Defendants' unit (without permission) while Defendants' wife was naked, causing tremendous fear, distress and shock to Defendants and Defendants' wife.

242.     Other tenants have made complaints about Plaintiffs also trespassing upon their units.

243.      Plaintiffs have thus engaged in invasion of privacy, illegal entry and harassment.

244.     The Plaintiffs have abused their right to reasonable access by entering Defendants' apartment without giving Defendants prior notice and without obtaining Defendants' consent. Plaintiffs have entered unannounced upon Defendants' wife while she was home alone and naked in the bathroom, causing tremendous distress. Plaintiffs have entered the apartment without permission. Defendants have been forced to file police reports about these issues including item missing from the apartment. Plaintiffs have had a pattern of doing the same thing to other tenants who also have made complaints and/or filed police reports against Plaintiffs.

245.     Defendants have been living in fear of continued illegal entry/trespass and have been forced to spend money on a camera security system to try to alleviate some of these fears.

246.     Plaintiffs have lied to the police and have resorted to protecting its maintenance staff from questions about the incident including issuing a ban prohibiting Defendants from speaking with maintenance staff even when maintenance staff is conducting a repair in the unit with Defendants present.

247.     Most recently, after these police reports have been filed, Plaintiffs have resorted to harassment of Defendants with continual threats to enter apartment without obtaining Defendants' consent, causing tremendous distress.

248.     Plaintiffs have acted intentionally, willfully, and with reckless disregard for Defendants' rights to exclusive possession of this unit, and, as a result, Defendants' are entitled to actual and punitive damages.

---

### *Counterclaim*
### Trespass To Personal Property

---

249.     Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

250.     On information and belief, Plaintiffs entered Defendants' unit without authorization, and removed property belonging to Defendants.

251.     Plaintiffs have acted intentionally, willfully, and with reckless disregard for Defendants' rights to exclusive possession of their personal property. As a result, Defendants' are entitled to damages.

---

*Counterclaim*
**Breach of Implied Covenant of Good Faith & Fair Dealing**

---

252.    Defendants hereby re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully stated herein.

253.    By entering into lease agreements with Defendants, Plaintiffs undertook a duty of good faith and fair dealing in its contractual relationship with the Defendants.

254.    Plaintiffs owed to Defendants a duty of utmost good faith and fair dealing and thereby were obligated to consider the welfare of Defendants, refrain from acting for purely selfish motives or private gain, and desist from destroying or injuring the right of the Defendants to receive the fruits of the contract.

255.    Plaintiffs have engaged in a breach of covenant of good faith and fair dealing as follows:

      a.    By making false and misleading representations to Defendants, Plaintiffs breached its duty of good faith and fair dealing to the Defendants.

      b.    By lying to Defendants and to tenants about the availability of accommodations.

      c.    As parties to the lease contract, Plaintiffs failed to deal with Defendants honestly, fairly, and in good faith, and has interfered with Defendants' right to receive the benefits of the lease contract. There has been an attempt to claim the benefit of a technical excuse for breaching the contract (i.e. that the elevator is only amenity and not part of the overall agreement to lease an apartment on the fourth floor/top floor).  There was a general understanding between the parties that there would be a working elevator when Defendants signed the agreement to lease that apartment. It was on the website, it was in advertisements all of over the internet that a working elevator was a feature of the luxury living. Nowhere in the contract does it say that the elevator is an amenity.

      d.    Plaintiffs have a contractual obligation to maintain the property including common areas which includes the elevator and the exits. Plaintiffs are trying to use specific contractual terms in isolation in order to refuse to perform their contractual obligations, despite the general circumstances and understandings between the parties.

256.    Through its actions and inactions, Plaintiffs breached its duty of good faith and fair dealing to Defendants, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm Defendants' rights and interests.

257.    As a result, Defendants has suffered damages.

---

*Counterclaim*
**Misrepresentation**

---

258.    Defendants re-allege and incorporate all paragraphs above as if fully set forth herein.

259.    Plaintiffs made misrepresentations to Defendants about the terms of the lease, which Defendants relied upon to their detriment.

260.    Plaintiffs made these misrepresentations in order to induce Defendants to enter into a lease arrangement and make Jefferson at Dedham Station their home.

261.    Plaintiffs' misrepresentations did induce Defendants to enter into contract and have suffered damages as a result.

262.    By enticing Defendants to enter into lease arrangements, Plaintiffs' practices have caused them harm.

263.    Accordingly, Defendants is entitled to damages and equitable remedies for Plaintiffs' misrepresentations.

---

## *Counterclaim*

### Violation of Massachusetts Civil Rights Act

---

264. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

265. By threats, intimidation and coercion, defendants have interfered and attempted to interfere with Defendants' rights, causing them harm, all as proscribed by G.L. c. 12 §§11H, 11I.

266. The foregoing actions and inactions of Plaintiffs constitute a violation of Massachusetts Civil Rights Act.

267. In consequence of Plaintiffs' actions, Defendants have suffered and will continue to suffer damages including, but not limited to, financial losses, pain and suffering, and emotional distress.

---

## *Counterclaim*

### Civil Conspiracy

---

268. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

269. Plaintiffs, acting in concert in furtherance of their scheme, committed unlawful acts and encouraged and enabled one another to do so to the injury of Defendants.

270. Plaintiffs knew that their acts and the acts of each other were violative of Defendants' rights.

271. In consequence of Plaintiffs' actions, Defendants have suffered and will continue to suffer damages including, but not limited to, financial losses, pain and suffering, and emotional distress.

---

*Counterclaim*
### Interference With Contractual Relations
(Laura Donahue, Chris Esmond, Kathleen Leito, Sarah McNeely)

272. Defendants hereby re-allege and incorporate by reference the foregoing paragraphs as if fully stated herein.

273. Defendants possessed a contractual relation with Landlord RAR2 Jefferson at Dedham Station MA-Inc.

274. Plaintiffs Laura Donahue, Chris Esmond, Kathleen Leito, Sarah McNeely have intentionally interfered with this contractual relationship with  Landlord RAR2 Jefferson at Dedham Station MA-Inc. through improper motives or means

275. As a result of Plaintiffs Laura Donahue, Chris Esmond, Kathleen Leito, Sarah McNeely misconduct, Defendants' contractual relations may be irretrievably damaged. Defendants have suffered and will continue to suffer substantial and irreparable harm.

276. By its above described conduct, *inter alia,* Plaintiffs has knowingly, improperly, and malevolently, and without lawful justification, intentionally and tortuously interfered with Defendants' actual and potential advantageous relations.

277. As a result of his intentional interference, Defendants have suffered and continues to suffer damages, including but not limited to financial loss, pain and suffering, and emotional distress.

---

## RELIEF SOUGHT PERTAINING TO COUNTERCLAIMS FOR DAMAGES

---

278. On all counterclaims and defenses, we should retain possession of our apartment.

279. On all counterclaims and defenses, we should receive money damages, costs, attorney's fees (where applicable), and such other relief as is just and proper.

---

### Request for a Jury Trial
(Part I, Article XV of the Mass. Constitution; USPR 8; and Mass. Gen. Laws c. 218, §19B)

280. Defendants claim their right to a trial by jury.

---

**WHEREFORE,** Tenants requests the following:

1. On all claims and defenses, award Tenants continued possession of their apartment and dismiss the plaintiffs' claim for possession.

2. Order the Landlords to provide the Tenants with their request for a reasonable accommodation;

2. On all claims and defenses, award Tenants money damages, costs, attorney's fees
(where applicable), and such other relief as is just and proper.

3) Enter a judgment in Tenants' favor on all counts of this answer and counterclaims as follows:

    a)   Award Tenants damages in an amount to be determined at trial, plus his reasonable attorney fees and the costs of (and any interest associated with) this action.

    b)   Enter a Preliminary Injunction, enjoining the Landlords to:

        i.   Provide a water leakage evaluation for Tenants' unit.

        ii.   Cease and desist from entering Tenants' apartment without first giving Tenants proper notice and obtaining Tenants' prior consent, except in case of a true bon a fide emergency.

        iii.   Cease and desist from harassing Tenants with threats of entering Tenants' apartment without giving Tenants' prior notice and without obtaining Tenants' consent.

        iv.   Preserve records, including electronic records, and evidence, as doing so would place no significant burden on them.

        v.   Provide an alternative unit as a reasonable accommodation for Tenants, if a structural engineer finds that Tenants' unit will continue to be subject to continual and frequent cracking and thus cannot be permanently fixed.

        vi.   Cease and desist from discrimination against blacks and Latinos.

        vii.   Cease and desist from racial steering and to always post all available units on their public online system.

    c)   Enter judgment against the Landlords in the form of a permanent injunction enjoining the Landlords from the conduct described herein.

    d)   Treble such amount as provided by M.G.L. ch. 93A, #9(3) and/or M.G.L. ch. 186, # 15B(7);

    e)   Order Landlords to pay compensatory damages to Tenants.

    f)   Abate the past and future rent of Plaintiff.

    g)   Award multiple damages to Tenants pursuant to M.G.L c. 93A

    h)   Issue a declaratory judgment stating that Landlords have breached the warranty of habitability and the terms of the lease agreement.

    i)   Grant all injunctive relief necessary to bring Landlords into compliance with their contractual obligations as described above.

    j)   Grant such other declaratory and injunctive relief as may be appropriate.

    k)   Award the Tenants punitive damages; and,

    l)   Award Tenants such other relief as the Court deems just and proper.

**DEFENDANTS REQUEST A TRIAL BY JURY ON ALL MATTERS SO TRIABLE.**

Respectfully Submitted,

_____/s/_____
**DEFENDANT ANDRE BISASOR**
3000 Presidents Way #3413
Dedham, MA 02026
781-492-5675

_____/s/_____
**DEFENDANT NATALIE ANDERSON**
3000 Presidents Way #3413
Dedham, MA 02026
617-710-7093

Dated:  May 11, 2015

**CERTIFICATE OF SERVICE**

I, Andre Bisasor, hereby certify that on this 11th day of May, 2015, I served a copy of the foregoing to the Plaintiff and to Plaintiff's counsel.

Subscribed under penalties of perjury.

/s/

_____
Andre Bisasor
3000 Presidents Way #3413
Dedham, MA 02026
781-492-5675

**CERTIFICATE OF SERVICE**

I, Natalie Anderson, hereby certify that on this 11th day of May, 2015, I served a copy of the foregoing to the Plaintiff and to Plaintiff's counsel.

Subscribed under penalties of perjury.

/s/

_____
Natalie Anderson
3000 Presidents Way #3413
Dedham, MA 02026
781-492-5675